T.C. Memo. 2008-74


UNITED STATES TAX COURT


ESTATE OF ANNA MIROWSKI, DECEASED, GINAT W. MIROWSKI AND ARIELLA
ROSENGARD, PERSONAL REPRESENTATIVES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15724-05.              Filed March 26, 2008.


Albert H. Turkus, Bryon A. Christensen, John P. Marston,

Sidney J. Silver, and Brian L. Alpert, for petitioners.

William J. Gregg, J. Craig Young, and Warren P. Simonsen,

for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


CHIECHI, Judge:  Respondent determined a deficiency of

$14,243,208.37 in Federal estate tax (estate tax) with respect to

the Estate of Anna Mirowski (decedent's estate).[1]

The issues remaining for decision are whether any of the assets owned by Mirowski Family Ventures, L.L.C. (MFV), are includible in the gross estate of Anna Mirowski (Ms. Mirowski or decedent) under section 2036(a),[2] 2038(a)(1), or 2035(a). We hold that none of the assets owned by MFV is includible in decedent's gross estate under any of those sections.

FINDINGS OF FACT

Many of the facts have been stipulated and are so found.

Ms. Mirowski was a resident of Owings Mills, Maryland, at the time of her death on September 11, 2001. Ginat W. Mirowski (Ginat Mirowski) and Ariella Rosengard, the personal representatives of decedent's estate and two of decedent's three daughters,[3] resided in Carmel, Indiana, and the United Kingdom, respectively, at the time they filed the petition in this case.

Ms. Mirowski, who was born on December 22, 1927, was the youngest of three daughters. Ms. Mirowski's parents, who were

---

[1]Respondent determined a deficiency of $4,769,233 in decedent's Federal gift tax (gift tax) for her taxable year 2001. The parties settled all the gift tax issues in this case.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect on the date of Ms. Mirowski's death. All Rule references are to the Tax Court Rules of Practice and Procedure.

[3]Ginat Mirowski is the oldest of decedent's daughters, Ariella Rosengard is the next oldest daughter, and Doris Frydman is the youngest daughter.

tailors in Lyon, France (Lyon), owned a clothing shop where Ms. Mirowski worked as a young girl. Eventually, Ms. Mirowski managed the family business and had responsibility for family investments until she moved to Israel after she married Mieczyslaw (Michel) Mirowski (Dr. Mirowski).

When Dr. Mirowski, who was born in Poland, was about 14 years old, Germany invaded Poland. Dr. Mirowski lost his family in the Holocaust. Thereafter, Dr. Mirowski moved to France, where he met and married Ms. Mirowski. They enjoyed a long, happy, and successful marriage.

While Dr. Mirowski was living in France, he attended medical school. After medical school, Dr. Mirowski moved with Ms. Mirowski to Israel where he continued his medical training and specialized in cardiology. While living in Israel, Dr. Mirowski developed a close relationship with Dr. Harry Heller (Dr. Heller), who was chief of medicine at the hospital where Dr. Mirowski trained and who became a father figure to Dr. Mirowski.

Dr. Heller suffered from ventricular fibrillation. At the time, the only treatment available for that condition was electric shock administered by a device known as a defibrillator (so-called external defibrillator), which, because of its large size, was located in the hospital. Despite his condition, Dr. Heller refused to stay constantly at the hospital close to a defibrillator and passed away from an episode of ventricular fibrillation

when he was not at the hospital.

Dr. Mirowski was very upset by Dr. Heller's death.  He determined to develop an implantable defibrillator device in order to prevent people, like Dr. Heller, who suffered from ventricular fibrillation from dying because they were not in a hospital near a defibrillator when they suffered an episode of that condition or from having to stay continuously in a hospital in order to be near a defibrillator in the event of such an episode.

In 1968, in order to obtain funding to develop an implantable defibrillator device, Dr. Mirowski and Ms. Mirowski emigrated to the United States.  Initially, Dr. Mirowski was ostracized in the medical community for his efforts to develop such a device.  He nonetheless persevered.  Over a ten-year period, Dr. Mirowski and a team of scientists developed an electronic device known as the automatic implantable cardioverter defibrillator (ICD) to monitor and correct abnormal heart rhythms.  In 1980, the ICD was successfully implanted for the first time in a human.[4]

Dr. Mirowski, who eventually became chief of cardiology at Sinai Hospital in Baltimore, Maryland (Baltimore), and a profes-

---

[4]At the time of the trial in this case, more than 1.2 million patients worldwide had received ICDs.  The ICD has been referred to as the greatest contribution to cardiology in the last century.

sor of medicine at Johns Hopkins University School of Medicine in Baltimore (Johns Hopkins Medical School), held various patents relating to the ICD (ICD patents).  Dr. Mirowski entered into an exclusive license agreement with respect to the ICD patents (ICD patents license agreement), under which, inter alia, he had the right to receive approximately 73 percent of the royalties paid for the use of those patents.[5]  During his lifetime, Dr. Mirowski received modest royalties under the ICD patents license agreement.

Some time after Dr. Mirowski and Ms. Mirowski emigrated to the United States, they and their family started the general practice of taking an annual one-week summer vacation in Rehoboth Beach, Delaware (Rehoboth Beach).  That practice continued after Ms. Mirowski's daughters married and had families of their own.  When the Mirowski family was vacationing in Rehoboth Beach, they took the opportunity to have annual meetings (Mirowski family annual meetings), at which they frequently discussed family business and investment matters.  At times, accountants or attorneys were invited to attend those meetings.

In 1989, it was determined that Ms. Mirowski had diabetes, and she became the patient of Dr. Charles Angell, an assistant professor of medicine at Johns Hopkins Medical School.  At a time

---

[5]The coinventor of the ICD had the right under the ICD patents license agreement to receive approximately 27 percent of the royalties paid for the use of the ICD patents.

not disclosed by the record, Ms. Mirowski developed hypertension.

On March 26, 1990, Dr. Mirowski died. At the time of Dr. Mirowski's death, Ginat Mirowski was a student at Harvard University in Cambridge, Massachusetts, from which she eventually obtained dental and medical degrees; Ariella Rosengard was a physician and a pathology resident at Johns Hopkins University Hospital in Baltimore (John Hopkins Hospital), was married, and had a daughter; and Doris Frydman was a medical student at Emory University in Atlanta, Georgia.

Pursuant to Dr. Mirowski's will, the ICD patents, his interest under the ICD patents license agreement, and the remainder of his assets, except for $600,000, passed to Ms. Mirowski.

Ms. Mirowski maintained a long and continuous history of making gifts to family members and friends. Throughout the ten-year period preceding her death in 2001, Ms. Mirowski continued to evaluate and make gifts to, or for the benefit of, her three daughters, her grandchildren,[6] and others. Whenever Ms. Mirowski made gifts to her daughters or to the respective trusts that she created for them (discussed below), she always paid the related gift tax.

On February 27, 1992, Ms. Mirowski created an irrevocable, so-called spendthrift trust for each of her three daughters and

---

[6]At the time of Ms. Mirowski's death, each of her daughters had two children.

their respective issue in order to provide for each daughter during the daughter's life and each daughter's children after the daughter died. (We shall refer to the respective trusts that Ms. Mirowski created for Ginat Mirowski, Ariella Rosengard, and Doris Frydman and their respective issue as the Ginat Trust, the Ariella Trust, and the Doris Trust. We shall refer collectively to those trusts as the daughters' trusts.) Ms. Mirowski named all three of her daughters as cotrustees of each of the daughters' trusts. She did so specifically because she wanted her daughters to work together and have a close working relationship.

Under the terms of each of the daughters' trusts, the trustees (1) had to pay income to the daughter for whom Ms. Mirowski created the trust and (2) had the discretion to pay principal to that daughter for her health, maintenance, education, and support. Upon the death of a daughter, the corpus of that daughter's trust was to continue to be held in trust or to be paid over to that daughter's issue, depending on the age of such issue.

On February 27, 1992, the same date on which Ms. Mirowski created her daughters' trusts, she funded the Ginat Trust and the Ariella Trust by transferring to each of those trusts five percent of her interest under the ICD patents license agreement. On the same date, Ms. Mirowski funded the Doris Trust by transferring to that trust ten percent of her interest under that

agreement. On June 30, 1993, Ms. Mirowski provided additional funding to the Ginat Trust and the Ariella Trust by transferring to each of those trusts 6.25 percent of her remaining interest under the ICD patents license agreement. After the above-described funding of the daughters' trusts, Ms. Mirowski held a 51.09-percent interest in the royalties under that agreement, and each of those trusts held a 7.2616-percent interest in those royalties.[7]

In addition to a long and continuous history of making gifts to family members and friends, Ms. Mirowski maintained a long and continuous history of making philanthropic and charitable gifts. After Dr. Mirowski died, Ms. Mirowski centered her charitable endeavors on keeping her husband's memory alive and furthering research in cardiology. To those ends, Ms. Mirowski made donations to (1) Hadassah Hospital in Israel, (2) Johns Hopkins Hospital where she created a professorship, a fellowship in cardiology, and a lectureship, (3) the University of Rochester in Rochester, New York, and (4) Sinai Hospital in Baltimore. In addition, in 1997 Ms. Mirowski created a charitable foundation known as Mirowski Family Foundation, Inc. (Foundation), through which she conducted various charitable endeavors.

---

[7]Dr. Mirowski's coinventor of the ICD continued to hold approximately a 27-percent interest in the royalties under the ICD patents license agreement.

For various reasons, sales of ICDs increased significantly after Dr. Mirowski died in 1990. As a result, the royalties received under the ICD patents license agreement by Ms. Mirowski and her daughters' trusts increased dramatically from thousands of dollars a year to millions of dollars a year. At the time of Ms. Mirowski's death, the royalties payable under that agreement to which MFV was entitled totaled millions of dollars a year.

Before Dr. Mirowski died, he was primarily responsible for managing the financial affairs of Ms. Mirowski and himself. After Dr. Mirowski's death, Ms. Mirowski, who did not remarry, became primarily responsible for managing her own financial affairs. When Ms. Mirowski first started investing, she was a highly conservative investor.

In order to assist Ms. Mirowski in managing her financial affairs after Dr. Mirowski died, Ariella Rosengard began to act as a bookkeeper for her. Thereafter, Ginat Mirowski, who frequently discussed her own investments with Ms. Mirowski, also acted as a bookkeeper for Ms. Mirowski and provided advice and suggestions to her regarding her investments. At no time did Ariella Rosengard or Ginat Mirowski make financial decisions for Ms. Mirowski.[8]

---

[8]Before Ms. Mirowski's death, Doris Frydman was not involved in Ms. Mirowski's financial affairs.

During the period in which Ariella Rosengard was performing bookkeeping functions for Ms. Mirowski, Ms. Mirowski's investments consisted primarily of securities issued by the United States Treasury Department (U.S. Treasury securities). Ms. Mirowski received directly the checks for any interest payments on those securities and deposited those checks into one of her various bank accounts. During that period, Ms. Mirowski preferred to have her investments and financial accounts tracked on a large spreadsheet, which permitted her to monitor them.

By 1998, after royalties from the ICD patents had increased dramatically, it became quite burdensome to use a large spreadsheet in order to track and manage Ms. Mirowski's investments and financial accounts. That was in large part because, even though Ms. Mirowski's investments were primarily of the same type (i.e., U.S. Treasury securities), she had over 84 accounts in ten different institutions.

In February 1998, at the suggestion of Ginat Mirowski, Ms. Mirowski met with William Lewin (Mr. Lewin) of Goldman, Sachs, & Co. (Goldman Sachs) regarding the establishment of an investment account with that firm. Ginat Mirowski made that suggestion to Ms. Mirowski because in 1992 she and her husband had met with Mr. Lewin and thereafter established an account at Goldman Sachs that Mr. Lewin managed. Over time, Ginat Mirowski concluded that the Goldman Sachs account that she and her husband maintained was

significantly outperforming investments that she and her husband managed on their own. As a result of the investment experience and success of the Goldman Sachs account of Ginat Mirowski and her husband, about which Ginat Mirowski told her mother, Ms. Mirowski began to realize that her investment portfolio could perform better if she were to diversify that portfolio and consolidate her investments at one investment firm.

Ms. Mirowski was a careful, deliberate, and thoughtful decisionmaker, especially with respect to financial matters. It was not until December 26, 1998, approximately 10 months after Ms. Mirowski first met with Mr. Lewin in February of that year, that she opened an account with Goldman Sachs (Ms. Mirowski's Goldman Sachs account). For an initial period after she opened that account, Ms. Mirowski continued to maintain investment accounts with other investment and financial institutions.

Beginning in January 1999, Ms. Mirowski deposited certain cash and securities into Ms. Mirowski's Goldman Sachs account. Initially, the securities that Ms. Mirowski deposited into Ms. Mirowski's Goldman Sachs account consisted of U.S. Treasury securities. Shortly after Ms. Mirowski opened Ms. Mirowski's Goldman Sachs account, at her direction, Goldman Sachs purchased municipal bonds for that account. Thereafter, at Ms. Mirowski's direction, Goldman Sachs purchased equities for Ms. Mirowski's Goldman Sachs account. All of those purchases were part of Ms.

Mirowski's plan to diversify her portfolio with the help of Goldman Sachs.

On May 11, 2000, representatives from Goldman Sachs made a presentation to Ms. Mirowski. During that presentation, those representatives described various strategies and considerations relating to investment management, including an overview of asset allocation and its importance in various portfolio allocation scenarios. Ms. Mirowski met or spoke with representatives from Goldman Sachs approximately three to five times a month in order to obtain an update on her investment portfolio and the moneys (e.g., interest payments) deposited into Ms. Mirowski's Goldman Sachs account. From time to time after Ms. Mirowski opened Ms. Mirowski's Goldman Sachs account, representatives of that firm advised her regarding particular investments or investment strategies. At times she accepted the suggestions of those representatives, and at other times she rejected them. Ms. Mirowski was a decisive investor and actively made every decision regarding the purchase of securities by Goldman Sachs for Ms. Mirowski's Goldman Sachs account. In early 2001, after Ms. Mirowski came to trust the Goldman Sachs representatives with whom she was dealing, she decided to consolidate all of her investments into the one account with Goldman Sachs that she had established (i.e., Ms. Mirowski's Goldman Sachs account).

In 1999, Ms. Mirowski's daughter Doris Frydman had neurologic surgery at Yale University Hospital to treat her chronic condition of epilepsy.  At least as early as late 1999 or early 2000, in large part because of her daughter Doris Frydman's condition, Ms. Mirowski began to think about ways, in addition to her daughters' trusts, to provide for her daughters and her grandchildren on an equal basis.  Moreover, at least as early as around that time, Ms. Mirowski started thinking about ways, in addition to her daughters' working together as trustees of each of the daughters' trusts, to allow them to work together and have a close working relationship.

In May 2000, Ms. Mirowski met with representatives of U.S. Trust (May 2000 meeting with U.S. Trust) at the home of Ariella Rosengard in Philadelphia.  At that time, representatives of U.S. Trust introduced Ms. Mirowski to the concept of a limited liability company (LLC).

After Ms. Mirowski's May 2000 meeting with U.S. Trust, she began discussing with her attorney Sidney J. Silver (Mr. Silver) the possibility of forming an LLC.  Thereafter, on August 31, 2000, Mr. Silver sent a letter (Mr. Silver's August 31, 2000 letter) to Ms. Mirowski and enclosed with that letter draft articles of organization and a draft operating agreement for an LLC to be named Mirowski Family Ventures, L.L.C.  Mr. Silver sent copies of that letter and those enclosures to Ms. Mirowski's

daughters. Mr. Silver's August 31, 2000 letter stated in pertinent part:

> Re: Financial and Tax Planning
>
> Dear Anna:
>
> In accordance with my recent telephone discussion with your daughter Ginat and my earlier discussion with your daughter Ariella, we have prepared drafts of two documents for your review and consideration in connection with financial and tax planning on behalf of you and your family as follows:
>
> 1. Articles of Organization of Mirowski Family Ventures, L.L.C.
>
> 2. Operating Agreement of Mirowski Family Ventures, L.L.C.
>
> By copy of this letter we are forwarding copies of these documents to each of your daughters for their review. After such documents have been reviewed we will be pleased to answer any questions or make such modifications you may request thereto.

Ms. Mirowski often waited until her family was together in order to have family discussions regarding any important decisions. The next time the family planned to be together after having received Mr. Silver's August 31, 2000 letter and the draft articles of organization and the draft operating agreement for an LLC was in August 2001. The family planned a meeting with Mr. Silver at that time, at which he was to explain Ms. Mirowski's plans.

In January 2001, Ms. Mirowski took a trip to France to visit her sister who had been hit by an automobile. During that trip, Ms. Mirowski wore tight shoes that caused a blister on her foot.

As a result of that blister and her diabetes, Ms. Mirowski developed a foot ulcer. In January 2001, after Ms. Mirowski returned to the United States from France, she began medical treatment for her foot ulcer. Although such an ulcer requires care and treatment, with proper treatment, a patient with a foot ulcer resulting from diabetes is expected to recover from such a condition.

On March 3, 2001, Ms. Mirowski signed an agreement for occupancy/residency rights in an apartment at a retirement community known as North Oaks (North Oaks retirement community), which is located near where Ms. Mirowski and her friends resided in Baltimore County, Maryland.

Ten days later, on March 13, 2001, when she was 73 years old, Ms. Mirowski underwent a surgical procedure at Johns Hopkins Hospital to treat her foot ulcer.

On July 22, 2001, Ms. Mirowski signed an agreement for occupancy/residency rights in an apartment at a retirement community known as Waverly Heights, Ltd. (Waverly Heights continuing care retirement community), which is located in Gladwne, Pennsylvania, near where Ariella Rosengard and Doris Frydman were living when Ms. Mirowski signed that agreement. On August 15, 2001, Waverly Heights accepted that agreement. Ms. Mirowski committed well over $500,000 for the occupancy/residency rights at the North Oaks retirement community and the Waverly Heights

continuing care retirement community for which she had contracted in 2001.

Ms. Mirowski planned to live primarily in the residence at the North Oaks retirement community. After Ms. Mirowski contracted in early March 2001 to buy that residence, she spent considerable resources, and she and her daughters spent considerable effort, in renovating it. Although Ms. Mirowski purchased a small studio apartment at the Waverly Heights continuing care retirement community, she did so only because a larger unit that she intended to acquire was not available; buying a smaller unit enabled her to obtain a preference on the Waverly Heights continuing care retirement community's waiting list for larger units.

Between March and August 2001, Ms. Mirowski received treatment for her foot ulcer from nurses who visited her at home and from her physician when she made intermittent visits to Johns Hopkins Hospital. Throughout the course of Ms. Mirowski's treatment for her foot ulcer, her physician talked to her family, in particular Ariella Rosengard, on numerous occasions about Ms. Mirowski's condition and treatment. Throughout that time, Ms. Mirowski's physician presented Ms. Mirowski and her family with a wide variety of appropriate medical treatment alternatives, including the possibility of amputation. From March 2001 until the time of her death, Ms. Mirowski consistently indicated that she was not comfortable with amputation because of its debilitat-

ing effects.

In mid-August 2001, Ms. Mirowski's daughters and their families took their annual vacation in Rehoboth Beach. During that vacation, on August 14, 2001, they held their previously planned Mirowski family annual meeting (August 14, 2001 Mirowski family annual meeting), to which they had invited Mr. Silver. Ms. Mirowski was not present at that meeting. At the August 14, 2001 Mirowski family annual meeting, Ms. Mirowski's daughters discussed with Mr. Silver the following: (1) Ms. Mirowski's plans to form MFV, (2) Ms. Mirowski's plans to make respective gifts of interests in MFV to her daughters' trusts, (3) the manner in which MFV was to function, and (4) the responsibilities of her daughters with respect to MFV.

At the time of the August 14, 2001 Mirowski family annual meeting, and thereafter until September 10, 2001, Ms. Mirowski's health was not rapidly deteriorating. In fact, on August 15, 2001, Ms. Mirowski visited her physician at Johns Hopkins Hospital for a preoperative evaluation with respect to the cataract surgery that she planned to have at that hospital. Ms. Mirowski planned to undergo cataract surgery in order to enhance her vision so that she could continue with her normal activities and improve her quality of life.

After the August 14, 2001 Mirowski family annual meeting, Mr. Silver finalized the documents required for Ms. Mirowski to

form MFV. Although Ms. Mirowski understood that certain tax benefits could result from forming MFV, those potential tax benefits were not the most significant factor in her decision to form MFV. To the contrary, Ms. Mirowski had the following legitimate and significant nontax purposes for forming, and transferring the bulk of her assets to, MFV: (1) Joint management of the family's assets by her daughters and eventually her grandchildren; (2) maintenance of the bulk of the family's assets in a single pool of assets in order to allow for investment opportunities that would not be available if Ms. Mirowski were to make a separate gift of a portion of her assets to each of her daughters or to each of her daughters' trusts; and (3) providing for each of her daughters and eventually each of her grandchildren on an equal basis.

With respect to Ms. Mirowski's purpose in forming MFV of having her daughters, and eventually her grandchildren, jointly manage the family's assets, that purpose was rooted in Ms. Mirowski's formative years in Lyon, where her family worked together in the family business.[9] Ms. Mirowski valued the family cohesiveness that joint management of a family business can foster. Although Ms. Mirowski was aware that her daughter

---

[9]After Ms. Mirowski left France and moved to Israel and ultimately to the United States with Dr. Mirowski and their daughters, Ms. Mirowski was unable to continue working together with her family in the family business in France, which she regretted very much.

Ariella Rosengard would probably move to England with her husband and children, Ms. Mirowski wanted her daughters, and eventually her grandchildren, to work together, remain closely knit, and be jointly involved in managing (1) the investments derived from the royalties received from Dr. Mirowski's invention of the ICD and (2) the business matters relating to the ICD patents and the ICD patents license agreement, including the litigation arising with respect to those patents and that license agreement.

With respect to Ms. Mirowski's purpose in forming MFV of maintaining in a single pool the bulk of the family's assets in order to allow for investment opportunities that would otherwise be unavailable, certain investment opportunities at Goldman Sachs would not have been available if Ms. Mirowski had separated her assets among her daughters or her daughters' trusts by giving a portion of those assets to each daughter or each trust.

With respect to Ms. Mirowski's purpose in forming MFV of providing for each of her daughters and eventually each of her grandchildren on an equal basis, the formation of MFV and the transfer by Ms. Mirowski of an equal interest in it to each of her daughters' trusts enabled Ms. Mirowski to ensure that her daughters, and eventually her grandchildren, would continue to hold respective interests of equal worth in the bulk of the family's assets.

In addition to the above-described legitimate and significant nontax purposes, another legitimate, but not significant, nontax reason Ms. Mirowski formed, and transferred the bulk of her assets to, MFV was that she wanted to provide additional protection from potential creditors for the interests in the family's assets that she intended to provide to her daughters and eventually her grandchildren. Although Ms. Mirowski was aware that her daughters' trusts included provisions providing spendthrift protection from creditors, she desired the additional creditor protection provided by an LLC, in particular the protection that an LLC would provide in the event of any negative developments in the respective marriages of her daughters.[10]

On August 22, 2001, Mr. Silver sent a letter (Mr. Silver's August 22, 2001 letter) to Ms. Mirowski and enclosed with that letter final versions of the articles of organization and the operating agreement for MFV that he had prepared. Mr. Silver sent copies of that letter and enclosures to Ms. Mirowski's three daughters. Mr. Silver's August 22, 2001 letter stated in pertinent part:

---

[10]At the time of the trial in this case, none of Ms. Mirowski's daughters had been married more than once. Nor had any of them ever been separated from her spouse because of marital problems.

Re:  Business, Financial & Estate Planning Matters

Dear Anna:

Reference is made to my correspondence to you of August 9, 2001 and my subsequent telephone discussions with you relative to the meeting that was held with your daughters Ginat Mirowski, Ariella Rosengard, Doris Frydman and their respective spouses on August 14, 2001.  We are beginning the process of implementing the Estate Plan which I recently discussed with you.

I am enclosing herewith bond copies of the following documents, the drafts of which were enclosed in my correspondence to you of August 9, 2001:

> 1.  Articles of Organization of Mirowski Family Ventures, L.L.C. * * *
>
> 2.  Operating Agreement of Mirowski Family Ventures, L.L.C. * * *

Please sign the Articles of Organization at the two places designated for your signature by an arrow. Please sign both copies of the Operating Agreement at the place designated for your signature on page 24 thereof, **leave the date blank** for the time being.  Upon full execution of both documents please return all copies to me in the enclosed Federal Express envelope.

Please do not hesitate to contact me if you have any questions with respect to the foregoing.

On August 27, 2001, Ms. Mirowski executed the articles of organization (MFV's articles of organization) to create Mirowski Family Ventures, L.L.C.  On the same date, she executed the operating agreement for MFV (MFV's operating agreement).[11] Except for MFV's operating agreement, at no time was there any

---

[11]MFV's articles of organization and MFV's operating agreement listed MFV's principal office as the address of Ms. Mirowski's residence in Owings Mills, Md.

express or unwritten agreement or understanding among Ms. Mirowski and her daughters regarding how MFV would be operated. On August 30, 2001, the department of assessments and taxation of the State of Maryland (Maryland department of assessments and taxation) accepted MFV's articles of organization for filing.[12]

On August 31, 2001, Ms. Mirowski was admitted to Johns Hopkins Hospital for further treatment of her foot ulcer.

On September 1, 2001, Ms. Mirowski made a bona fide, arm's-length transfer (Ms. Mirowski's September 1, 2001 transfer) to MFV of certain property, including the ICD patents and Ms. Mirowski's 51.09-percent interest under the ICD patents license agreement,[13] and received in exchange for that property a 100-percent interest in MFV. After Ms. Mirowski's September 1, 2001 transfer, Ms. Mirowski was the only member of MFV. Since MFV was formed, no person other than Ms. Mirowski made any transfers of property to MFV.

On September 5, 2001, Ms. Mirowski's physician noted an intention to discuss with Ms. Mirowski's daughters the need to plan for her long-term care when she returned home after her discharge from the hospital.

_____

[12]MFV requested expedited processing by the Maryland department of assessments and taxation for which it paid an additional $90 fee.

[13]Ms. Mirowski transferred her 51.09-percent interest under the ICD patents license agreement pursuant to a document entitled "ASSIGNMENT OF ALL RIGHT, TITLE & INTEREST".

On September 5, 2001, Ms. Mirowski made another bona fide, arm's-length transfer (Ms. Mirowski's September 5, 2001 transfer) to MFV of certain property consisting of securities with an aggregate value of $60,578,298.08 that she held in Ms. Mirowski's Goldman Sachs account.[14] Ms. Mirowski authorized Goldman Sachs to effect Ms. Mirowski's September 5, 2001 transfer by transferring securities valued at $60,578,298.08 from Ms. Mirowski's Goldman Sachs account to another account established at Goldman Sachs in the name of MFV (MFV's Goldman Sachs account). After Ms. Mirowski's September 5, 2001 transfer, Ms. Mirowski continued to hold a 100-percent interest in MFV.

On September 6 and 7, 2001, Ms. Mirowski made additional bona fide, arm's-length transfers (Ms. Mirowski's September 6 and 7, 2001 transfers) to MFV of certain property consisting of securities and cash with an aggregate value of $1,525,008.80 that she held in Ms. Mirowski's Goldman Sachs account. Ms. Mirowski's September 6 and 7, 2001 transfers were effected by Goldman Sachs in the same manner in which that firm effected Ms. Mirowski's September 5, 2001 transfer. After Ms. Mirowski's September 6 and 7 transfers, Ms. Mirowski continued to hold a 100-percent interest in MFV. (We shall refer collectively to Ms. Mirowski's September 1, 2001 transfer, Ms. Mirowski's September 5, 2001

---

[14]As of Sept. 1, 2001, Ms. Mirowski's Goldman Sachs account had a total value of $72,965,935.71.

transfer, and Ms. Mirowski's September 6 and 7, 2001 transfer to MFV as Ms. Mirowski's transfers to MFV.)

At no time did Ms. Mirowski contemplate forming MFV without making a gift of an interest in MFV to each of her daughters' trusts. Thus, on September 7, 2001, Ms. Mirowski made a gift of a 16-percent interest in MFV to each of those trusts.[15] Those gifts were an integral part of Ms. Mirowski's plan in forming and transferring the bulk of her assets to MFV. (We shall sometimes refer collectively to Ms. Mirowski's respective gifts of 16-percent interests in MFV to her daughters' trusts as Ms. Mirowski's gifts.)

Ms. Mirowski understood that, based upon the value of the assets that she transferred to MFV in exchange for a 100-percent interest in MFV, her respective gifts of 16-percent interests in MFV to her daughters' trusts would result in a substantial gift tax for 2001. Ms. Mirowski's daughters were not aware of specifically how Ms. Mirowski planned to pay the substantial gift tax on those gifts. However, they were aware that Ms. Mirowski had retained substantial personal assets that she did not transfer to MFV, including over $3 million in cash and cash equivalents. Ms. Mirowski's daughters also knew that Ms. Mirowski anticipated

---

[15]Except for the respective gifts to her daughters' trusts that Ms. Mirowski made in 1992 and 1993, Ms. Mirowski made no gifts to those trusts before her respective gifts on Sept. 7, 2001, of 16-percent interests in MFV.

receiving as an interest holder in MFV future income of millions of dollars a year attributable to royalty payments under the ICD patents license agreement. In addition, Ms. Mirowski's daughters believed that Ms. Mirowski could have borrowed against her interest in MFV in order to pay the substantial gift tax liability attributable to her respective gifts to her daughters' trusts of 16-percent interests in MFV. At no time before Ms. Mirowski's death did the members of MFV have any express or unwritten agreement or understanding to distribute assets of MFV in order to pay that gift tax liability.

After the respective gifts to her daughters' trusts of 16-percent interests in MFV, Ms. Mirowski held a 52-percent interest, and each of those trusts held a 16-percent interest, in MFV. As discussed above, MFV held a 51.09-percent interest under the ICD patents license agreement after Ms. Mirowski's September 1, 2001 transfer to MFV. Each of the daughters' trusts continued to hold a 7.2616-percent interest under the ICD patents license agreement after Ms. Mirowski made a gift of a 16-percent interest in MFV to each of those trusts.

After Ms. Mirowski's transfers to MFV, she retained in her individual name the following assets (personal assets) valued at approximately $7,598,000: Ms. Mirowski's home valued at

$799,000; cash[16] and cash equivalents of approximately $3,308,000; personal property consisting primarily of fine art valued at approximately $1,892,000; a loan of $305,640 due from North Oaks retirement community pursuant to the North Oaks residency agreement and loan agreement that Ms. Mirowski signed on March 3, 2001; a right to receive a refund of $203,301 that she paid as an occupancy rights fee pursuant to the Waverly Heights residence and care agreement dated August 14, 2001; a promissory note of Ginat Mirowski and her husband that had an outstanding balance of $136,499.99, plus accrued interest of $205.96; a promissory note of Ariella Rosengard and her husband that had an outstanding balance of $460,110.73, plus accrued interest of $922.26; and a promissory note of Doris Frydman and her husband that had an outstanding balance of $500,000, plus accrued interest of $915.67.[17]  In addition, Ms. Mirowski was the beneficiary of a trust established under Dr. Mirowski's will that had a value of $620,000.  At no time before Ms. Mirowski died

[16]At the end of 2000, Ms. Mirowski's cash holdings consisted of approximately $160,000 in accounts with certain banks.

[17]Article SECOND, paragraph (b), of the last will and testament of Ms. Mirowski provided that all indebtedness owed to her at the time of her death by any of her daughters was to be canceled.  Article SECOND, paragraph (c), of that last will and testament directed Ms. Mirowski's personal representative to use a formula specified therein in order to equalize the aggregate benefits to be received by each of her daughters from her estate. That formula was dependent upon the amount of indebtedness owed to Ms. Mirowski by each of her daughters at the time of her death.

were the assets of MFV commingled with her personal assets. At no time was there any express or unwritten agreement or understanding among Ms. Mirowski and her daughters that Ms. Mirowski would distribute assets from MFV in order to pay any unexpected financial obligations of Ms. Mirowski.

After Ms. Mirowski's transfers to MFV, Ms. Mirowski retained more than enough personal assets to meet her living expenses. However, Ms. Mirowski did not retain enough personal assets in order to pay from those assets the substantial gift tax for which she would be liable with respect to her contemplated respective gifts of 16-percent interests in MFV to her daughters' trusts. Nonetheless, in order to pay that anticipated gift tax liability and any unexpected financial obligations, Ms. Mirowski could have (1) used a portion of the over $7.5 million of personal assets that she retained and did not transfer to MFV, including cash and cash equivalents of over $3.3 million, (2) used a portion or all of the distributions that she expected to receive as an interest holder in MFV of the millions of dollars of royalty payments under the ICD patents license agreement that she expected MFV to receive, and (3) borrowed against (a) the personal assets that she retained and did not transfer to MFV and (b) her 52-percent interest in MFV.

At the time of and after Ms. Mirowski's respective gifts of 16-percent interests in MFV to her daughters' trusts, there was

no express or unwritten agreement or understanding among the members of MFV that Ms. Mirowski, at her own discretion, could have access to any of the assets that she transferred to MFV for her own possession or enjoyment, the right to income from those assets, or the right to determine who could possess or enjoy those assets. Nor was there any express or unwritten agreement or understanding among the members of MFV that Ms. Mirowski (1) would retain during her life the economic use and benefits of the assets that she transferred to MFV and (2) would provide for her daughters and her grandchildren only upon her death.

Pursuant to section I[18] and section 3.6 of MFV's operating agreement, the capital account of Ms. Mirowski was to be credited with the respective contributions of property that she made to MFV on September 1, 5, 6, and 7, 2001, and her capital account was to be properly maintained thereafter.

Pursuant to section I of MFV's operating agreement, as a result of Ms. Mirowski's gift of a 16-percent interest in MFV to each of her daughters' trusts, each of those trusts succeeded to the capital account of Ms. Mirowski to the extent the capital account was attributable to the 16-percent interest in MFV that Ms. Mirowski gave to each trust.

---

[18]Section I of MFV's operating agreement is titled "DEFINED TERMS". Pertinent portions of that operating agreement are quoted in the appendix hereto.

Pursuant to section 3.4 of MFV's operating agreement,[19] no interest holder,[20] including Ms. Mirowski, was to have the right to receive the return of any capital contribution except as otherwise provided in that agreement. The only provision in MFV's operating agreement for the return of a capital contribution to an interest holder was in the event of the liquidation and dissolution of MFV.[21] Pursuant to section 4.4.1 of MFV's

---

[19]Section III of MFV's operating agreement is titled "Members; Capital; Capital Accounts".

[20]Section I of MFV's operating agreement defined the term "Interest Holder" to mean "any Person who holds a Membership Interest, whether as a Member or as unadmitted assignee of a Member." Section I of MFV's operating agreement defined the term "Member" to mean "each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company."

[21]Section VII of MFV's operating agreement, titled "Dissolutions, Liquidation and Termination of the Company", addressed, inter alia, the distribution of MFV's assets upon its liquidation and dissolution. Section 7.2 of MFV's operating agreement provided:

> 7.2. Procedure for Winding Up and Dissolution.
> If the Company is dissolved, the General Manager shall wind up its affairs. On winding up of the Company, the assets of the Company shall be distributed,
>
> (i) to creditors of the Company, including Interest Holders who are creditors, in satisfaction of the liabilities of the Company;
>
> (ii) to Interest Holders and former Interest Holders in satisfaction of unpaid distributions;
>
> (iii) to Interest Holders for the return of Capital Contributions; and

(continued...)

operating agreement,[22] if MFV were to be liquidated, its assets were required to be distributed to the interest holders in MFV in accordance with the balances in their respective capital accounts. Pursuant to MFV's operating agreement, during the normal course of MFV's operations, Ms. Mirowski was not entitled to the return of the assets that she transferred to MFV.

Pursuant to section 5.1.1 of MFV's operating agreement,[23] MFV was to be managed by a general manager who could be, but did not have to be, a member of MFV. That section of MFV's operating agreement designated Ms. Mirowski to serve as the initial general manager of MFV. All of Ms. Mirowski's powers as MFV's initial general manager were subject to other provisions of MFV's operating agreement and the requirements of applicable law, including the applicable law of the State of Maryland (Maryland law), which imposed on her a fiduciary duty to the other members of MFV.[24]

---

[21](...continued)
        (iv) to Interest Holders in proportion to their respective Capital Accounts and then to the Interest Holders in accordance with Section 4.4 [relating to the distribution of MFV's assets upon its liquidation and dissolution].

[22]Section 4.4 of MFV's operating agreement is titled "Liquidation and Dissolution."

[23]Section V of MFV's operating agreement is titled "Management: Rights, Powers and Duties".

[24]Section 5.1.2 of MFV's operating agreement described the general powers of MFV's general manager in pertinent part as follows:

(continued...)

Although Ms. Mirowski held a 52-percent interest in MFV and was its general manager, pursuant to section 5.1.2.3, 5.1.3.1, and 5.1.3.2 of MFV's operating agreement, she could not sell or otherwise dispose of any of the assets of MFV, other than in the ordinary course of MFV's operations, without the approval of all the members of MFV.[25]  Pursuant to section 7.1.1 of MFV's operating agreement, Ms. Mirowski could not liquidate and dissolve MFV without the approval of all the members of MFV.  Pursuant to section 5.1.3.1 and 5.1.3.4 of that operating agreement, Ms. Mirowski could not admit additional members to MFV without the

---

[24](...continued)
5.1.2.  <u>General Powers</u>.  The General Manager shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs * * *

[25]In other words, pursuant to section 5.1.3.1 and 5.1.3.2 of MFV's operating agreement, Ms. Mirowski could not undertake any "Capital Transaction" without the approval of all MFV's members. The term "Capital Transaction" is defined in section I of MFV's operating agreement to mean:

any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds.

As used hereinafter, the term "capital transaction" shall have the meaning set forth in section I of MFV's operating agreement.

approval of all the members of MFV.

Pursuant to section 4.1.1 of MFV's operating agreement,[26] profit or loss (other than profit or loss derived from a capital transaction) for any taxable year was to be allocated to MFV's interest holders in proportion to their respective percentage interests in MFV.

Pursuant to section 4.1.2 of MFV's operating agreement, MFV was required to make within 75 days after the end of each taxable year distributions to MFV's interest holders of MFV's cash flow[27] for the taxable year in proportion to such members' respective percentage interests in MFV.

Pursuant to section 4.2.1 and section 4.2.2 of MFV's operating agreement,[28] profit or loss from a capital transaction was to

---

[26]Section 4.1 of MFV's operating agreement is titled "Distributions of Cash Flow and Allocations of Profit or Loss Other than Capital Transactions."

[27]The term "Cash Flow" is defined in section I of MFV's operating agreement to mean:

> all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any non-cash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements or replacements as determined in the sole discretion of the General Manager. Cash Flow shall not include Capital Proceeds but shall be increased by the reduction of any reserve previously established.

[28]Section 4.2 of MFV's operating agreement is titled "Distribution of Capital Proceeds and Allocation of Profit or Loss

(continued...)

be allocated to MFV's interest holders in proportion to their respective capital accounts.

Pursuant to section 4.2.3 of MFV's operating agreement, "Capital Proceeds [i.e., gross receipts from a capital transaction] shall be distributed" in proportion to the respective capital accounts of MFV's interest holders after the payment of all expenses incident to the capital transaction, the payment of debts and liabilities due and outstanding, and the establishment of any reserves that MFV's general manager deemed necessary for MFV's liabilities or obligations.

Pursuant to section 4.5.1 of MFV's operating agreement,[29] except as otherwise provided in that agreement, "the timing and the amount of all distributions shall be determined by the Members holding a majority of the Percentages then outstanding."

Pursuant to section 7.1.2 of MFV's operating agreement, the occurrence of a so-called involuntary withdrawal of a member, which included the death of a member, was to cause MFV to be dissolved unless the remaining members of MFV unanimously were to elect to continue MFV's business pursuant to the terms of MFV's operating agreement.

---

[28](...continued)
from Capital Transactions."

[29]Section 4.5 of MFV's operating agreement is titled "General."

From August 31, 2001, when Ms. Mirowski was admitted to Johns Hopkins Hospital for further treatment of her foot ulcer, until her condition unexpectedly deteriorated significantly on September 10, 2001, the expectation of the members of the medical staff at Johns Hopkins Hospital who were responsible for treating Ms. Mirowski was that the treatment of her foot ulcer would allow her to recover and return to her home.  At no time before September 10, 2001, did Ms. Mirowski, her family, or her physicians expect her to die.  Consequently, at no time did Ms. Mirowski and her daughters discuss or anticipate the estate tax and similar transfer taxes and the other estate obligations that would arise only as a result of Ms. Mirowski's death.

Ms. Mirowski's daughters spoke with their mother frequently, sometimes multiple times a day and at other times several times a week.  During the period Ms. Mirowski was being treated for her foot ulcer, Ariella Rosengard spoke to Ms. Mirowski's physicians on a regular basis.  As both a daughter and a physician herself, Ariella Rosengard was highly familiar with her mother's medical condition.  Moreover, during that same period, Ariella Rosengard not only spoke with Ms. Mirowski several times a day but also visited her almost every weekend and sometimes during the middle of the week.  Sometime in early September 2001, Ariella Rosengard and Ms. Mirowski discussed Ms. Mirowski's intention to travel to Philadelphia to attend Ariella Rosengard's annual open house for

Rosh Hashanah that was to take place on September 18, 2001. Ms. Mirowski told Ariella Rosengard that she intended to bring various desserts for that open house, as she had done in past years.

On September 3, 2001, Ginat Mirowski, her husband, and her two children visited Ms. Mirowski at Johns Hopkins Hospital. At that time, Ginat Mirowski and her family expected Ms. Mirowski to return home after she received antibiotics and surgical treatment for her foot ulcer. Between that time and September 10, 2001, the day before Ms. Mirowski died, Ginat Mirowski and her family communicated multiple times with Ms. Mirowski. At those times, Ms. Mirowski sounded quite upbeat and spoke of feeling well.

On September 6, 2001, Ariella Rosengard left the United States in order to attend a medical conference in Strasbourg, France (Strasbourg). While in France, Ariella Rosengard spoke to Ms. Mirowski on each of the days September 7, 8, and 9, 2001, and believed that her mother's life was not in jeopardy on any of those days. At that time, Ariella Rosengard (1) understood that her mother was receiving, as she had in the past, intravenous and surgical treatment for her foot ulcer and (2) expected her mother to return home at the conclusion of that treatment. If Ariella Rosengard had believed that her mother's health was rapidly declining on September 6, 2001, such that her mother's life was in jeopardy, she would not have left the United States to attend

the medical conference in Strasbourg.  Moreover, if Ms. Mirowski believed that her health was rapidly declining on September 6, 2001, she would have wanted Ariella Rosengard to remain in the United States to be close to her sisters.

On September 10, 2001, Ginat Mirowski called her mother at Johns Hopkins Hospital and noticed that she did not sound like herself.  Later that day, Ginat Mirowski canceled her clinic appointments for the week and traveled to Johns Hopkins Hospital to visit her mother.

Unexpectedly, on September 10, 2001, Ms. Mirowski's condition deteriorated significantly.  At that point, amputation was recommended by her physician as a means of avoiding further complications, including possible life-threatening infections.  Ms. Mirowski declined amputation.  On September 10, 2001, Ms. Mirowski began to suffer from multiple system failure and refused all additional medical treatment.  As a result of the significantly worsening condition of Ms. Mirowski's foot ulcer and her decision not to have the infected limb amputated, she developed sepsis, a severe and often life-threatening illness caused by an overwhelming infection of the blood stream by toxin-producing bacteria.

On September 11, 2001, at 8:55 a.m. approximately one day after the onset of Ms. Mirowski's development of sepsis, she died.

Shortly after Ms. Mirowski died, on September 16, 2001, decedent's estate, through its personal representatives, and the remaining members of MFV (i.e., the daughters' trusts), through their respective trustees (i.e., Ms. Mirowski's daughters), executed a memorandum regarding MFV's operating agreement. In that memorandum, inter alia, each of those trusts, through its trustees, acknowledged receipt of an interest and membership in MFV.[30]

On September 16, 2001, the remaining members of MFV (i.e., the daughters' trusts), through their respective trustees, also held a special meeting (September 16, 2001 special meeting). At that meeting, those members elected the following officers in order to continue MFV's business: Ginat Mirowski as its general manager and president, Doris Frydman as its vice president, and Ariella Rosengard as its secretary/treasurer. At the September 16, 2001 special meeting, the remaining members of MFV (i.e., the daughters' trusts) also discussed, through their respective trustees, MFV's Goldman Sachs account that MFV had recently opened, and they passed a resolution authorizing and ratifying the establishment and maintenance of that account.

---

[30]An exhibit attached to the memorandum regarding MFV's operating agreement reflected the Sept. 7, 2001 respective membership interests in MFV of decedent and the daughters' trusts after Ms. Mirowski's respective gifts of 16-percent interests in MFV to those trusts, as well as the amount of decedent's basis in the 16-percent interest that she gave to each of those trusts, which carried over to each trust.

Pursuant to Ms. Mirowski's will, the daughters' trusts inherited, in equal shares, Ms. Mirowski's 52-percent interest in MFV. As a result, after the probate of decedent's will is closed, those trusts will own collectively 100 percent of MFV in three equal shares.

Ms. Mirowski died on the day on which there were terrorist attacks in the United States. Those terrorist attacks created market conditions that were particularly advantageous to diversifying MFV's investment holdings, and MFV's investment holdings were further diversified shortly after Ms. Mirowski died. Although the precise timing of the diversification of MFV's investment holdings following Ms. Mirowski's death was attributable to the terrorist attacks on the date of her death, that diversification was in accordance with the intentions of Ms. Mirowski before she died.

Since Ms. Mirowski's death, the daughters' trusts, as the remaining members of MFV, have chosen not to receive distributions of all of MFV's annual cash flow, as defined in MFV's operating agreement. Instead, they decided that MFV will reinvest all of that cash flow beyond that required for payment of taxes and expenses by the members. MFV's members feel strongly that the benefits of reinvesting MFV's annual cash flow far outweigh any benefits that could be derived from distributing it.

At all relevant times, including after Ms. Mirowski's death, MFV has been a valid functioning investment operation and has been managing business matters relating to the ICD patents and the ICD patents license agreement, including related litigation. As Ms. Mirowski had hoped, her daughters, in their capacities as officers of MFV and as trustees of MFV's members, have actively worked together to manage MFV's assets. Ms. Mirowski's daughters have held meetings with representatives of Goldman Sachs approximately three to four times a year in order to review MFV's Goldman Sachs' account performance and asset allocation and to determine what, if any, changes should be made in the future. For at least one of those meetings each year, all of Ms. Mirowski's daughters have been present in person. For the several other meetings each year, the daughters have met together in person or have participated in a meeting by teleconference. All of Ms. Mirowski's daughters jointly have made investment decisions for MFV and plan to have each of their respective children also become involved in such decisionmaking when they reach the appropriate age. In addition, Ms. Mirowski's daughters have worked together on matters concerning the business of managing the ICD patents, the ICD patents license agreement, and related litigation. At the time of the trial in this case, there was substantial ongoing litigation relating to those patents and that license agreement with respect to which Ms. Mirowski's

daughters communicated several times a week with MFV's attorney Mr. Silver.

As Ms. Mirowski also had hoped, MFV's members have benefited from having MFV's assets held in a single pool, rather than held separately by Ms. Mirowski's daughters or the daughters' trusts. For example, Goldman Sachs charges lower fees for larger accounts. In addition, MFV has had the opportunity to participate in certain investments that would not have been available on an individual basis to Ms. Mirowski's daughters or her daughters' trusts if, instead of creating MFV, transferring the bulk of her assets to it, and giving certain interests in MFV to those trusts, Ms. Mirowski had made a separate gift of her assets to each of her daughters or each of those trusts.

During 2002, MFV, which had made no distributions during 2001, made distributions totaling $36,415,810 to decedent's estate in order for decedent's estate to pay Federal and State transfer taxes, legal fees, and other obligations of decedent's estate.[31] At the time in 2002 when MFV made distributions to decedent's estate, MFV's members (i.e., the daughters' trusts), through their respective trustees (i.e., Ms. Mirowski's daughters), agreed and decided that MFV should not make distributions

_____

[31]The Federal and State transfer taxes paid with funds that MFV distributed to decedent's estate during 2002 totaled $30,911,301.77, of which $11,750,623 was Ms. Mirowski's estimated gift tax for 2001 that, as discussed below, decedent's estate paid in April 2002.

to themselves.[32]  In making that decision, MFV's members had in mind that those members will own collectively 100 percent of MFV, in three equal shares, after decedent's estate is closed.

For each of the years 1991 through 2001, Ms. Mirowski filed Form 709, United States Gift (and Generation-Skipping Transfer) Tax Return (Form 709), to reflect the substantial gifts that she made during each of those years to, or for the benefit of, her daughters, her grandchildren, and certain others.[33]  The aggregate value of the gifts that Ms. Mirowski made during the years 1991 through 2001 was $24,715,921.[34]

On April 14, 2002, decedent's estate paid estimated gift tax of $11,750,623 with funds that MFV distributed to it.  Thereafter, on or about July 20, 2002, decedent's personal representatives timely filed Form 709 for 2001 on behalf of decedent (2001 Form 709).[35]  Those representatives reported in that form Ms.

---

[32]In other words, MFV's members agreed and decided that during 2002 MFV should not make pro rata distributions to all of the interest holders of MFV.  Form 1065, U.S. Return of Partnership Income (Form 1065), for MFV's taxable year 2002 erroneously reported for reasons not disclosed by the record that the distributions that MFV made during that year were charged against the respective capital accounts of MFV's interest holders on virtually a pro rata basis.

[33]Ms. Mirowski also filed amended Form 709 for each of the years 1992 and 1993.

[34]From 1991 through 2000, Ms. Mirowski made charitable gifts totaling in excess of $12,500,000.

[35]The 2001 Form 709 erroneously reported for reasons not
(continued...)

Mirowski's gift on September 7, 2001, to each of her daughters' trusts of a 16-percent interest in MFV and valued each of those gifts at $5,700,000.[36]  In the 2001 Form 709, decedent's personal representatives reported gift tax for 2001 of $9,729,280, which resulted in a credit to decedent's estate of $2,021,343.[37]

Decedent's estate timely filed Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return.  Form 706 showed estate tax of $14,119,863.13, which decedent's estate paid on June 10, 2002, with funds that MFV distributed to it.[38]

Respondent issued to decedent's estate a notice of deficiency, in which respondent determined an estate tax deficiency of $14,243,208.37.  In support of that deficiency determination, respondent determined, inter alia, to increase decedent's gross

---

[35](...continued)
disclosed by the record that Ms. Mirowski made gifts of furniture on Sept. 10, 2001, to Ariella Rosengard valued at $25,500 and gifts of jewelry on the same date to Doris Frydman valued at $45,295.  Ms. Mirowski did not in fact make those gifts on Sept. 10, 2001, as reported in the 2001 Form 709.  When Ms. Mirowski purchased the items of furniture and jewelry in question, she had her daughters Ariella Rosengard and Doris Frydman in mind and intended to make those respective gifts to them during her life.

[36]In the parties' stipulation of settled issues, the parties agreed that the value of the 16-percent interest in MFV that Ms. Mirowski gave to each of her daughters' trusts is $6,810,350. See supra note 1.

[37]See supra notes 1 and 36.

[38]The liability shown in the Maryland estate tax return that decedent's estate filed was $5,040,815.64, which decedent's estate paid on June 10, 2002, with funds that MFV distributed to it.  See supra note 31.

estate by $43,385,000 (i.e., from $27,768,000 to $71,153,000) with respect to decedent's interest in MFV. Respondent did so because respondent determined that the total of the respective date-of-death fair market values of all of the assets that decedent transferred to MFV is includible in her gross estate under section 2036(a).

On October 7, 2003, more than two years after Ms. Mirowski died, MFV unintentionally forfeited its charter under Maryland law because it failed to file required personal property tax returns.[39] It was one of respondent's employees who brought that forfeiture to the attention of MFV. Immediately thereafter, steps were taken to reinstate the charter under Maryland law, which included filing a personal property tax return on behalf of MFV with the State of Maryland for each of the years 2002 through 2004. On February 9, 2004, the department of assessments and taxation of Maryland issued a certificate of good standing to transact business to MFV, thereby reinstating its charter. Under Maryland law, the reinstatement of a forfeited charter is retro-active to the date of forfeiture. As a result, a company subject to Maryland law is treated as if the forfeiture never occurred. Since MFV's charter was reinstated in February 2004, MFV has remained in good standing under Maryland law and has filed

---

[39]Since its formation in 2001, MFV did not hold any personal property within the State of Maryland.

personal property returns required by the State of Maryland.

OPINION

The issues remaining for decision are whether any of the assets owned by MFV are includible in decedent's gross estate under section 2036(a), 2038(a)(1), or 2035(a).

Respondent does not address the burden of proof in this case.[40]  According to decedent's estate,

> Generally, for issues or theories put forth by Respondent in the notice of deficiency, the taxpayer bears the burden of proof, and for Respondent's issues or theories not included in the notice of deficiency, Respondent bears the burden of proof. * * * Because Respondent did not raise IRC sections 2038 and 2035 in its notice of deficiency in this case, Respondent bears the burden with respect to its theories under those sections; however, in any case the evidence will not support a decision in Respondent's favor.

Neither party addresses section 7491(a).  We conclude that resolution of the issues presented under sections 2036(a), 2038(a)(1), and 2035(a) does not depend on who has the burden of proof.

---

[40]With respect to sec. 2036(a), respondent asserts on brief:

> The burden of disproving the existence of an agreement regarding retained economic enjoyment of the transferred property rests on the estate, and this burden has been characterized as particularly onerous in intrafamily situations. * * * [Citations omitted.]

Section 2036(a)

In order to resolve the parties' dispute under section 2036(a),[41] we must consider the following factual issues (1) with respect to Ms. Mirowski's transfers to MFV and (2) with respect to her respective gifts of 16-percent interests in MFV to her daughters' trusts:

(1) Was there a transfer of property by Ms. Mirowski?

(2) If there was a transfer of property by Ms. Mirowski, was such a transfer not a bona fide sale for an adequate and full consideration in money or money's worth?

(3) If there was a transfer of property by Ms. Mirowski that was not a bona fide sale for an adequate and full consideration in money or money's worth, (a) did Ms. Mirowski retain the

---

[41]Sec. 2036(a) provides:

SEC. 2036. TRANSFERS WITH RETAINED LIFE ESTATE.

(a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

(1) the possession or enjoyment of, or the right to the income from, the property, or

(2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

possession or the enjoyment of, or the right to the income from, the property transferred within the meaning of section 2036(a)(1) or (b) did she retain, either alone or in conjunction with any person, the right to designate the persons who shall possess or enjoy the property transferred or the income therefrom within the meaning of section 2036(a)(2)?

### Ms. Mirowski's Transfers to MFV

#### Transfer of Property by Ms. Mirowski

Decedent's estate acknowledges that Ms. Mirowski made transfers of property to MFV on September 1, 5, 6, and 7, 2001. In light of that acknowledgment by decedent's estate, we find that Ms. Mirowski's transfers to MFV were transfers of property under section 2036(a).

#### Transfer Other Than a Bona Fide Sale for an Adequate and Full Consideration in Money or Money's Worth

Section 2036(a) excepts from its application any transfer of property otherwise subject to that section which is a "bona fide sale for an adequate and full consideration in money or money's worth". The foregoing exception is limited to a transfer of property where the transferor "has received benefit in full consideration in a genuine arm's length transaction". Estate of Goetchius v. Commissioner, 17 T.C. 495, 503 (1951). More recently, we held that the exception in section 2036(a) for a bona fide sale for an adequate and full consideration in money or money's worth is satisfied in the context of a family limited

partnership

> where the record establishes the existence of a legiti-
> mate and significant nontax reason for creating the
> family limited partnership, and the transferors re-
> ceived partnership interests proportionate to the value
> of the property transferred.  See, e.g., Estate of
> Stone v. Commissioner, * * * [T.C. Memo. 2003-309].
> The objective evidence must indicate that the nontax
> reason was a significant factor that motivated the
> partnership's creation.  A significant purpose must be
> an actual motivation, not a theoretical justification.
> [Certain citations omitted.]

Estate of Bongard v. Commissioner, 124 T.C. 95, 118 (2005).

It is the position of decedent's estate that Ms. Mirowski's transfers to MFV were bona fide sales for adequate and full consideration in money or money's worth under section 2036(a). In support of that position, decedent's estate contends that Ms. Mirowski had legitimate and substantial nontax purposes for forming, and transferring assets to, MFV, that Ms. Mirowski received an interest in MFV proportionate to the value of the assets that she transferred to it, that Ms. Mirowski's capital account was properly credited with those assets, and that, in the event of a liquidation and dissolution of MFV, Ms. Mirowski had the right to a distribution of property from MFV in accordance with her capital account.

Respondent counters that the exception under section 2036(a) for a bona fide sale for an adequate and full consideration in money or money's worth does not apply to Ms. Mirowski's transfers to MFV.  In support of that position, respondent contends that

there was no legitimate, significant nontax reason for Ms. Mirowski's forming, and transferring assets to, MFV. In advancing that contention, respondent asks the Court to disregard the respective testimonies of Ginat Mirowski and Ariella Rosengard, two of decedent's three daughters and the personal representatives of decedent's estate, regarding the nontax reasons Ms. Mirowski decided to form and fund MFV. According to respondent, the relationship of those witnesses to decedent and to decedent's estate colored their respective testimonies.[42] As the trier of

---

[42]In support of respondent's argument that the Court should disregard the respective testimonies of Ginat Mirowski and Ariella Rosengard regarding the nontax reasons Ms. Mirowski formed and funded MFV, respondent also maintains (1) that those reasons "are unsupported by any contemporaneous corroborating evidence" and (2) that the "only contemporaneous" evidence in the record regarding the reasons Ms. Mirowski formed and funded MFV is Mr. Silver's August 22, 2001 letter to Ms. Mirowski, which contradicts the respective testimonies of Ginat Mirowski and Ariella Rosengard and supports respondent's position that Ms. Mirowski did so for estate tax reasons.

With respect to respondent's assertion that there is no "contemporaneous corroborating evidence" supporting the nontax reasons for forming and funding MFV about which Ginat Mirowski and Ariella Rosengard testified, as discussed below, we found Ginat Mirowski and Ariella Rosengard to be completely candid, sincere, and credible and accorded controlling weight to their respective testimonies.

With respect to respondent's assertion that the "only contemporaneous" evidence in the record regarding the reasons Ms. Mirowski formed and funded MFV is Mr. Silver's August 22, 2001 letter to Ms. Mirowski, which contradicts the respective testimonies of Ginat Mirowski and Ariella Rosengard and supports respondent's position that Ms. Mirowski did so for estate tax reasons, respondent quotes the following sentence from Mr. Silver's August 22, 2001 letter: "'We are beginning the process of implementing

(continued...)

fact, we disagree.

We evaluated the respective testimonies of Ginat Mirowski and Ariella Rosengard by observing each of those witnesses' candor, sincerity, and demeanor. We also evaluated the reasonableness of the respective testimonies of those witnesses. We found Ginat Mirowski and Ariella Rosengard to be completely candid, sincere, and credible and their respective testimonies to be reasonable. We accorded controlling weight to the respective testimonies of Ginat Mirowski and Ariella Rosengard, which we concluded was appropriate on the record before us. We relied on those testimonies in making our findings of fact, including our findings that Ms. Mirowski had the following legitimate and significant nontax reasons for forming, and transferring certain

---

[42](...continued)
the **Estate Plan** which I recently discussed with you' (emphasis added)." What respondent ignores is that Mr. Silver's August 22, 2001 letter enclosing final articles of organization and a final operating agreement for MFV describes the matters discussed in that letter as "Business, Financial & Estate Planning Matters". Respondent also ignores that Mr. Silver's August 31, 2000 letter to Ms. Mirowski enclosing draft articles of organization and a draft operating agreement for MFV, which were virtually identical to the final versions of those documents, states that those drafts were undertaken "in connection with financial and tax planning on behalf of" Ms. Mirowski and her family. Decedent's estate does not deny, and we have found on the record before us, that Ms. Mirowski understood that certain tax benefits could result from forming MFV. However, decedent's estate maintains, and we have found on that record, that potential tax benefits were not the most significant factor in her decision to do so.

assets to, MFV:[43]  (1) Joint management of the family's assets by her daughters and eventually her grandchildren;[44] (2) maintenance of the bulk of the family's assets in a single pool of assets in order to allow for investment opportunities that would not be

---

[43]We also found on the basis of the respective testimonies of Ginat Mirowski and Ariella Rosengard that another legitimate nontax reason Ms. Mirowski formed and funded MFV was that she wanted to provide protection from potential creditors for the interests in the family's assets that she intended to provide to her daughters and her grandchildren in addition to the creditor protection provided by her daughters' trusts that, as so-called spendthrift trusts, were penetrable by creditors for purposes of alimony or child support.  See Zouck v. Zouck, 104 A.2d 573, 575, 578-580 (Md. 1954); Safe Deposit & Trust Co. v. Robertson, 65 A.2d 292 (Md. 1949).  We found that Ms. Mirowski's desire for additional creditor protection was not a significant reason in her decision to form and fund MFV.

[44]On the record before us, we find that Ms. Mirowski's significant and legitimate nontax purpose in forming and funding MFV of ensuring joint management of the family's assets by her daughters and eventually her grandchildren, standing alone, is sufficient to satisfy the requirement that, in order to qualify for the exception in sec. 2036(a) for a bona fide sale for an adequate and full consideration in money or money's worth, there must be a legitimate and significant nontax reason for creating the entity in question.  Ms. Mirowski's nontax reason in forming and funding MFV of ensuring joint management of the family's assets by her daughters and eventually her grandchildren was rooted in Ms. Mirowski's formative years in Lyon where she and her family worked together in the family business.  Ms. Mirowski valued the family cohesiveness that joint management of a family business can foster.  Although Ms. Mirowski was aware that her daughter Ariella Rosengard would probably move to England with her husband and children, Ms. Mirowski wanted her daughters, and eventually her grandchildren, to work together, remain closely knit, and be jointly involved in managing (1) the investments derived from the royalties received from Dr. Mirowski's invention of the ICD and (2) the business matters relating to the ICD patents and the ICD patents license agreement, including the litigation arising with respect to those patents and that license agreement.  Her daughters have done so.

available if Ms. Mirowski were to make a separate gift of a portion of her assets to each of her daughters or to each of her daughters' trusts; and (3) providing for each of her daughters and eventually each of her grandchildren on an equal basis.[45]

In support of respondent's position that the exception under section 2036(a) for a bona fide sale for an adequate and full consideration in money or money's worth does not apply to Ms. Mirowski's transfers to MFV, respondent advances certain other contentions, including the following:  (1) Ms. Mirowski failed to retain sufficient assets outside of MFV for her anticipated financial obligations (respondent's contention (1)); (2) MFV lacked any valid functioning business operation (respondent's contention (2)); (3) Ms. Mirowski delayed forming and funding MFV until shortly before her death and her health had begun to fail (respondent's contention (3)); (4) Ms. Mirowski sat on both sides of Ms. Mirowski's transfers to MFV (respondent's contention (4));

---

[45]Ms. Mirowski's formation of MFV and her lifetime gift of an equal interest in it to each of her daughters' trusts enabled Ms. Mirowski to ensure that her daughters and eventually her grandchildren would continue to hold respective interests of equal worth in the bulk of the family's assets.

Respondent asserts that under Estate of Bongard v. Commissioner, 124 T.C. 95 (2005), facilitation of lifetime giving may never qualify as a significant nontax reason for forming and funding a family LLC or a family partnership.  We reject respondent's assertion.  In Estate of Bongard, we did not conclude that an intention to facilitate lifetime giving may never be a significant nontax factor.  Rather, we found on the record presented there that such an intention was not a significant nontax reason for forming the partnership involved in that case.  Id. at 127.

and (5) after Ms. Mirowski died, MFV made distributions totaling $36,415,810 to decedent's estate that that estate used to pay Federal and State transfer taxes, legal fees, and other estate obligations (respondent's contention (5)).[46]  According to respondent, certain caselaw[47] supports respondent's view that the presence of the foregoing types of factors necessarily establishes in the instant case the absence of a bona fide sale for an adequate and full consideration in money or money's worth under section 2036(a).

With respect to respondent's contentions (1), (2), and (3), those contentions are not supported by the record in this case and/or ignore material facts that we have found on the basis of that record.  We reject those contentions.

With respect to respondent's contention (1), we have found that the only anticipated significant financial obligation of Ms.

_____

[46]Respondent also points out that MFV's Form 1065 for its taxable year 2002 erroneously reported that the distributions that MFV made during that year were charged against its respective members' capital accounts on virtually a pro rata basis. The record does not disclose why that form contained that error. In any event, we do not find that error to be a material factor in our resolving the issues presented.

[47]The caselaw on which respondent relies includes Estate of Korby v. Commissioner, 471 F.3d 848 (8th Cir. 2006), affg. T.C. Memo. 2005-103, Estate of Thompson v. Commissioner, 382 F.3d 367 (3d Cir. 2004), affg. T.C. Memo. 2002-246, Estate of Rosen v. Commissioner, T.C. Memo. 2006-115, Estate of Strangi v. Commissioner, T.C. Memo. 2003-145, affd. on one ground only 417 F.3d 468 (5th Cir. 2005), Estate of Harper v. Commissioner, T.C. Memo. 2002-121, and Estate of Harrison v. Commissioner, T.C. Memo. 1987-8.

Mirowski when she formed and funded MFV was the substantial gift

tax for which she would be liable with respect to her contem-

plated respective gifts of 16-percent interests in MFV to her

daughters' trusts. We have also found that at no time before Ms.

Mirowski's death did the members of MFV have any express or

unwritten agreement or understanding to distribute assets of MFV

in order to pay that gift tax liability. In order to pay the

anticipated gift tax liability with respect to her contemplated

respective gifts of 16-percent interests in MFV to her daughters'

trusts, Ms. Mirowski could have (1) used a portion of the over

$7.5 million of personal assets that she retained and did not

transfer to MFV, including cash and cash equivalents of over $3.3

million, (2) used a portion or all of the distributions that she

expected to receive as a 52-percent interest holder in MFV of the

millions of dollars of royalty payments under the ICD patents

license agreement that she expected MFV to receive, and

(3) borrowed against (a) the personal assets that she retained

and did not transfer to MFV and (b) her 52-percent interest in

MFV,[48] see Md. Code Ann., Corps. & Assns. sec. 4A-602 (West

---

[48]Under applicable Maryland law, the interest of a member in an LLC constitutes personal property, Md. Code Ann., Corps. & Assns. sec. 4A-602 (West 2008), and the term "security interest" is defined as an interest in personal property that secures payment or performance of an obligation, Md. Code Ann., Com. Law sec. 1-201(37) (West 2008). Thus, under applicable Maryland law, a member of an LLC may grant an interest in that member's interest in the LLC in order to secure payment of a loan.

2008); Md. Code Ann., Com. Law sec. 1-201(37) (West 2008).

With respect to respondent's contention (1), we have also found that at no time before September 10, 2001, when Ms. Mirowski's condition unexpectedly deteriorated significantly, did Ms. Mirowski, her daughters, or her physicians expect her to die and that consequently at no time did Ms. Mirowski and her daughters discuss or anticipate the estate tax and similar transfer taxes and the other estate obligations that would arise only as a result of Ms. Mirowski's death.[49]

With respect to respondent's contention (2), we have found that at all relevant times, including after Ms. Mirowski's death, MFV has been a valid functioning investment operation and has been managing the business matters relating to the ICD patents and the ICD patents license agreement, including related litiga-

---

[49]The estate tax that would arise only as a result of Ms. Mirowski's death would not have been the obligation of Ms. Mirowski. The estate tax is imposed on "the transfer of the taxable estate" of a person who dies, sec. 2001(a), and the liability for the payment of the estate tax is imposed on the executor (or other personal representative) of the estate, sec. 2002. Moreover, unless the estate tax is paid in full or becomes unenforceable by reason of the lapse of time, the estate tax generally

> shall be a lien upon the gross estate of the decedent for 10 years from the date of death, except that such part of the gross estate as is used for the payment of charges against the estate and expenses of its adminis-tration, allowed by any court having jurisdiction thereof, shall be divested of such lien.

Sec. 6324(a)(1).

tion.  Moreover, we reject the suggestion in respondent's conten-
tion (2) that the activities of MFV had to rise to the level of a
"business" under the Federal income tax laws in order for the
exception under section 2036(a) for a bona fide sale for an
adequate and full consideration in money or money's worth to
apply.[50]

With respect to respondent's contention (3), as discussed
above with respect to respondent's contention (1), we have found
that at no time before September 10, 2001, when Ms. Mirowski's
condition unexpectedly deteriorated significantly, did Ms.
Mirowski, her daughters, or her physicians expect her to die and
that consequently at no time did Ms. Mirowski and her daughters
discuss or anticipate the estate tax and similar transfer taxes
and the other estate obligations that would arise only as a
result of Ms. Mirowski's death.  We have also found that Ms.
Mirowski was being treated since January 2001 both at home and at
Johns Hopkins Hospital for a diabetic foot ulcer and that she was
admitted to Johns Hopkins Hospital on August 31, 2001, for
further treatment of that ulcer.  In addition, we have found that
at all times throughout the course of her treatment from January
2001 until September 10, 2001, when Ms. Mirowski's condition
unexpectedly deteriorated significantly, the expectations of the

---

[50]See, e.g., <u>Estate of Stone v. Commissioner</u>, T.C. Memo.
2003-309.

members of the medical staff at that hospital who were responsible for treating Ms. Mirowski and the expectations of Ms. Mirowski and her daughters were that the treatment of her foot ulcer would allow her to recover.

With respect to respondent's contention (4), that contention reads out of section 2036(a) in the case of any single-member LLC the exception for a bona fide sale for an adequate and full consideration in money or money's worth that Congress expressly prescribed when it enacted that statute. Respondent's contention (4) also ignores that Ms. Mirowski fully funded MFV; her daughters' trusts did not contribute any assets to that company. Instead, each of those trusts was the recipient of a gift from Ms. Mirowski consisting of a 16-percent interest in MFV. We reject respondent's contention (4).

With respect to respondent's contention (5), that contention ignores our findings that at no time before September 10, 2001, when Ms. Mirowski's condition unexpectedly deteriorated significantly, did Ms. Mirowski, her family, or her physicians expect her to die and that consequently at no time did Ms. Mirowski and her daughters discuss or anticipate the estate tax and similar transfer taxes and the other estate obligations that would arise only as a result of Ms. Mirowski's death.[51] Moreover, we reject the suggestion of respondent that respondent's contention (5) is

_____

[51]See supra note 49.

determinative in the instant case of whether Ms. Mirowski's transfers to MFV were bona fide sales for adequate and full consideration in money or money's worth under section 2036(a).

With respect to respondent's reliance on certain caselaw to support respondent's view that the existence of the various alleged contentions advanced by respondent necessarily establishes in the instant case the absence of a bona fide sale for an adequate and full consideration in money or money's worth under section 2036(a), we find the cases on which respondent relies to be factually distinguishable from the instant case and respondent's reliance on them to be misplaced.[52]

In support of respondent's position that the exception under section 2036(a) for a bona fide sale for an adequate and full consideration in money or money's worth does not apply to Ms. Mirowski's transfers to MFV, respondent also contends that, because Ms. Mirowski did not at any time contemplate forming and funding MFV without making respective gifts of 16-percent interests in MFV to her daughters' trusts, Ms. Mirowski, "in substance, * * * received only a 52% MFV interest" in exchange for Ms. Mirowski's transfers to MFV of 100 percent of its assets. As a result, according to respondent, Ms. Mirowski "did not receive

_____

[52]For example, the Court did not find in any of the cases on which respondent relies that there was a significant and legitimate nontax reason for the transfer involved to which the Court held sec. 2036(a) applied.

adequate and full consideration in the form of a proportionate MFV interest." On the record before us, we reject respondent's contention. Ms. Mirowski made two separate, albeit integrally related, transfers of property that are at issue in this case, namely, Ms. Mirowski's transfers to MFV of certain assets on September 1, 5, 6, and 7, 2001, and Ms. Mirowski's respective gifts of 16-percent interests in MFV to her daughters' trusts on September 7, 2001. In return for Ms. Mirowski's transfers to MFV, Ms. Mirowski received and held 100 percent of the interests in MFV. In return for Ms. Mirowski's respective gifts to her daughters' trusts, Ms. Mirowski received and held nothing.[53]

On the record before us, we find that Ms. Mirowski received an interest in MFV proportionate to the value of the assets that she transferred to it on September 1, 5, 6, and 7, 2001. On that record, we also find that Ms. Mirowski's capital account was properly credited with the assets that she transferred to it on September 1, 5, 6, and 7, 2001, and that, in the event of a liquidation and dissolution of MFV, Ms. Mirowski had the right to a distribution of property from MFV in accordance with her capital account.

---

[53]Decedent's personal representatives timely filed Form 709 for 2001 on behalf of decedent, in which those representatives reported Ms. Mirowski's gifts. The parties have resolved their dispute relating to the total value of those gifts.

Based upon our examination of the entire record before us, we find that Ms. Mirowski's transfers to MFV were bona fide sales for adequate and full consideration in money or money's worth under section 2036(a). Based upon that examination, we further find that the exception under section 2036(a) for a bona fide sale for an adequate and full consideration in money or money's worth applies to Ms. Mirowski's transfers to MFV.

> Possession or Enjoyment of, or Right to Income From, the Property Transferred or Right To Designate the Persons Who Shall Possess or Enjoy the Property Transferred or the Income From Such Property

We have found that Ms. Mirowski's transfers to MFV were bona fide sales for adequate and full consideration in money or money's worth under section 2036(a). Consequently, we need not, and we shall not, address with respect to those transfers the factual issue presented under section 2036(a)(1) as to whether Ms. Mirowski retained for life the possession or the enjoyment of, or the right to the income from, the property transferred or the factual issue presented under section 2036(a)(2) as to whether Ms. Mirowski retained for life the right, either alone or in conjunction with any person, to designate who shall possess or enjoy the property transferred or the income therefrom.

Based upon our examination of the entire record before us, we hold that section 2036(a) does not apply to Ms. Mirowski's transfers to MFV.

Ms. Mirowski's Gifts

### Transfer of Property by Ms. Mirowski

Decedent's estate acknowledges that Ms. Mirowski's respective gifts of 16-percent interests in MFV to her daughters' trusts on September 7, 2001, were transfers of property. In light of that acknowledgment by decedent's estate, we find that Ms. Mirowski's gifts were transfers of property under section 2036(a).

### Transfer Other Than a Bona Fide Sale for an Adequate and Full Consideration in Money or Money's Worth

Decedent's estate also acknowledges that Ms. Mirowski's gifts were not bona fide sales for adequate and full consideration in money and money's worth under section 2036(a). In light of that acknowledgment by decedent's estate, we find that Ms. Mirowski's gifts were not bona fide sales for adequate and full consideration in money or money's worth under section 2036(a).

### Possession or Enjoyment of, or Right to Income From, the Property Transferred or Right To Designate the Persons Who Shall Possess or Enjoy the Property Transferred or the Income From Such Property

The parties agree that an interest or a right described in section 2036(a)(1) and (2) is treated as having been retained if at the time of the transfer of property there was an express or implied agreement or understanding that the interest or right would later be conferred. See sec. 20.2036-1(a), Estate Tax Regs. They disagree over whether there was such an express or

implied agreement or understanding at the time Ms. Mirowski made
respective gifts of 16-percent interests in MFV to her daughters'
trusts.

### Possession or Enjoyment of, or Right to Income From, the Property Transferred

It is the position of decedent's estate that

> there was no understanding, express or implied, that
> decedent retained [sic] any interest in the 16% MFV
> interests that had been transferred to the [respective]
> Trusts for the benefit of decedent's daughters and
> their issue. * * * Decedent completed those gifts of
> MFV interests on September 7, 2001, and thereafter had
> no right to receive, and did not receive, any benefit
> whatsoever from such interests. * * *
>
> Moreover, this case does not involve the kinds of
> facts that have led courts to find implied agreements
> that a decedent has retained an interest in the
> decedent-transferred property. * * *

Respondent counters that at the time of Ms. Mirowski's gifts
and at the time of her death an agreement, both express and
implied, existed that Ms. Mirowski retain the possession or the
enjoyment of, or the right to the income from, the respective 16-
percent interests in MFV that she gave to her daughters'
trusts.[54]

In support of respondent's contention that at the time of
Ms. Mirowski's gifts and at the time of her death there was an

_____

[54]As discussed below, respondent advances the same conten-
tion with respect to the respective 16-percent interests in MFV
that Ms. Mirowski gave to her daughters' trusts in support of
respondent's argument under sec. 2036(a)(2) that Ms. Mirowski
"retained the right to designate the persons who could possess or
enjoy the assets or the income therefrom during her lifetime."

express agreement that Ms. Mirowski retain an interest or a right described in section 2036(a)(1) with respect to the respective 16-percent interests in MFV that she gave to her daughters' trusts, respondent asserts:

> Decedent was designated MFV's General Manager at the time of its formation, and continued to be its General Manager until the time of her death. * * * [MFV's operating agreement section] 5.1.1. * * * As General Manager, decedent had sole and exclusive authority to manage MFV's affairs. * * * [MFV's operating agreement section] 5.1.2. * * * Her authority included the authority to decide the timing and amounts of distributions from MFV. * * * [MFV's operating agreement section] 4.5.1. * * * Decedent could not be removed and replaced as General Manager because, even after the gifts to the daughters' trusts, she still held a majority (52%) interest. * * * [MFV's operating agreement section] 5.1.5. * * * Thus, when decedent formed and funded MFV and at her death, she expressly retained, [sic] the right to possession or enjoyment of, or the right to the income from, the transferred assets * * *.

The linchpin in respondent's argument that at the time of Ms. Mirowski's gifts and at the time of her death Ms. Mirowski expressly retained the right to the possession or the enjoyment of, or the right to the income from, the respective 16-percent interests in MFV that she gave to her daughters' trusts is that under section 4.5.1 of MFV's operating agreement "Her authority [as MFV's general manager] included the authority to decide the timing and amounts of distributions from MFV." Before addressing respondent's contention regarding section 4.5.1 of MFV's operating agreement, we shall describe the authority that Ms. Mirowski had as MFV's general manager under that agreement.

Pursuant to section 5.1.1 of MFV's operating agreement, MFV was to be managed by a general manager, and the initial general manager was to be Ms. Mirowski.  Section 5.1.2 of MFV's operating agreement provided:

> The General Manager shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs * * *[55]

On the record before us, we find that, pursuant to section 5.1.2 of MFV's operating agreement, Ms. Mirowski's discretion, power, and authority as MFV's general manager were subject to the other provisions of MFV's operating agreement, including section 4.1 (regarding the distribution of cash flow and the allocation of profit or loss from transactions other than capital transactions); section 4.2 (regarding the distribution of capital proceeds and the allocation of profit or loss from capital transactions); section 4.4 (regarding the distribution of MFV's assets upon the liquidation and dissolution of MFV); section

---

[55]MFV's operating agreement expressly listed in section 5.1.2 various powers, including the following, that were among the powers of MFV's general manager, subject in all cases to the other provisions of that operating agreement and the requirements of applicable law:  Acquire by purchase, lease, or otherwise any real or personal property; sell, dispose of, trade, or exchange MFV's assets in the ordinary course of MFV's business; borrow money for and on behalf of MFV; enter into any kind of activity necessary to, in connection with, or incidental to the accomplishment of the purposes of MFV; and invest and reinvest MFV reserves in short-term instruments or money market funds.

5.1.3 (regarding extraordinary transactions); section 7.1 (regarding events resulting in the dissolution of MFV); and section 7.2 (regarding the procedure for winding up and dissolving MFV). On that record, we further find that, pursuant to section 5.1.2 of MFV's operating agreement, Ms. Mirowski's discretion, power, and authority as MFV's general manager were subject to the requirements of applicable Maryland law, including the Maryland law that imposed on her fiduciary duties to the other members of MFV, namely, her daughters' trusts[56] to which she made respective gifts of 16-percent interests in MFV.[57]  See Robinson v. Geo Licensing Co., L.L.C., 173 F. Supp. 2d 419, 427 (D. Md. 2001); Froelich v. Erikson, 96 F. Supp. 2d 507, 526 (D. Md. 2000), affd. per curiam sub nom. Froelich v. Senior Campus Living, L.L.C., 5 Fed. Appx. 287 (4th Cir. 2001).

On the record before us, we find that the discretion, power, and authority that MFV's operating agreement granted to Ms. Mirowski as MFV's general manager do not require us to find that at the time of Ms. Mirowski's gifts and at the time of her death there was an express agreement that Ms. Mirowski retain an

---

[56]Ms. Mirowski held no powers over her daughters' trusts. Ms. Mirowski's daughters as the trustees of each of the daughters' trusts were subject to the fiduciary duties imposed on them by Maryland law.  See, e.g., Madden v. Mercantile-Safe Deposit & Trust Co., 339 A.2d 340, 348 (Md. Ct. Spec. App. 1975).

[57]We find nothing in the record that establishes that Ms. Mirowski intended to, or did, violate her fiduciary duties under Maryland law.

interest or a right described in section 2036(a)(1) (or section 2036(a)(2)) with respect to the respective 16-percent interests in MFV that she gave to her daughters' trusts.

We turn now to the linchpin in respondent's contention that at the time of Ms. Mirowski's gifts and at the time of her death there was an express agreement in section 4.5.1 of MFV's operating agreement that Ms. Mirowski retain an interest or a right described in section 2036(a)(1) with respect to the respective 16-percent interests in MFV that she gave to her daughters' trusts. According to respondent, under section 4.5.1 of MFV's operating agreement, as MFV's general manager, Ms. Mirowski's "authority included the authority to decide the timing and amounts of distributions from MFV."[58] That section of MFV's operating agreement provides: "Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Members holding a majority of the Percentages then outstanding."

Contrary to respondent's contention, section 4.5.1 of MFV's operating agreement did not give Ms. Mirowski as MFV's general manager the authority to determine the timing and the amount of all distributions from MFV. Any authority that Ms. Mirowski had under that section was in her capacity as the member of MFV who owned a majority of the outstanding percentage interests in MFV

---

[58]See supra note 54.

(majority percentage member of MFV).  Moreover, any authority that section 4.5.1 of MFV's operating agreement gave Ms. Mirowski as the majority percentage member of MFV did not include the authority to determine the timing and the amount of distributions from MFV where that agreement "otherwise provided".  That agreement otherwise provided in, inter alia, section 4.1 and 4.2.

Pursuant to section 4.1 of MFV's operating agreement, Ms. Mirowski had no authority as the majority percentage member of MFV (or as MFV's general manager) to determine for each taxable year the distribution of MFV's cash flow (i.e., cash funds derived in the ordinary course of MFV's operations) or the allocation of MFV's profit or loss from the ordinary course of MFV's operations.  With respect to the distribution of MFV's cash flow, section 4.1.2 of MFV's operating agreement provided that "Cash Flow for each taxable year * * * shall be distributed to the Interest Holders * * * no later than seventy-five (75) days after the end of the taxable year."[59]  Section 4.1.2 of MFV's operating agreement is unequivocal in mandating the distribution of MFV's cash flow no later than 75 days after the end of a taxable year.

---

[59]Section 4.1 of MFV's operating agreement required for each taxable year the allocation of profit or loss from the ordinary course of MFV's operations and the distribution of MFV's cash flow to MFV's interest holders in proportion to their respective percentage interests in MFV.

Pursuant to section 4.2 of MFV's operating agreement, Ms. Mirowski had no authority as the majority percentage member of MFV (or as MFV's general manager) to determine the distribution of MFV's capital proceeds (i.e., gross receipts from a capital transaction, namely, a transaction not in the ordinary course of MFV's operations) or the allocation of profit or loss from any capital transaction.[60] With respect to the distribution of MFV's capital proceeds, section 4.2.3 of MFV's operating agreement provided that "Capital Proceeds shall be distributed and applied by the Company" as specified in that section.[61] Section 4.2.3 of MFV's operating agreement is unequivocal in mandating the distribution (and application) of MFV's capital proceeds as specified in that section.

In an attempt to qualify the unequivocal words of section 4.2.3 of MFV's operating agreement mandating the distribution of MFV's capital proceeds, respondent attempts to inflate the

---

[60]Pursuant to section 5.1.3.1 and 5.1.3.2 of MFV's operating agreement, Ms. Mirowski did not have the authority as MFV's general manager (or as the majority percentage member of MFV) to undertake, inter alia, a capital transaction, the only type of transaction under that operating agreement giving rise to capital proceeds, unless all of MFV's members approved.

[61]Section 4.2 of MFV's operating agreement required the allocation of profit or loss from any MFV capital transaction and the distribution of MFV's capital proceeds to MFV's interest holders in proportion to their respective capital accounts. Respondent does not dispute that, in general, the respective capital account balances of MFV's interest holders matched those interest holders' respective percentage interests in MFV.

significance of the language "no later than seventy-five (75) days after the end of the taxable year" appearing in section 4.1.2 of MFV's operating agreement that mandates the distribution of MFV's cash flow.  We reject respondent's reliance on that language to change the unequivocal words of section 4.2.3 of MFV's operating agreement mandating the distribution of MFV's capital proceeds.

Section 4.1.2 of MFV's operating agreement governs the distribution of MFV's cash flow "for each taxable year" of MFV. Thus, that section cannot be implemented until a taxable year of MFV has ended.  It is only after the end of a taxable year that cash flow and profit or loss from the ordinary course of MFV's operations for the taxable year may be computed, allocated, and distributed as required by section 4.1 of MFV's operating agreement.  Section 4.1.2 of MFV's operating agreement ensures that there will be enough time after the end of each taxable year, but no more than 75 days after the end of each such year, within which to make the computations, allocations, and distributions for each such taxable year required by section 4.1 of MFV's operating agreement.  There was no reason to add similar language to section 4.2 of MFV's operating agreement.  That is because the term "capital proceeds" is defined in section I of MFV's operating agreement as "the gross receipts received by the Company from a Capital Transaction."  As soon as each capital transaction of

MFV is undertaken, section 4.2 of MFV's operating agreement requires the allocation of profit or loss and the distribution and the application of capital proceeds from that capital transaction as specified in that section.

On the record before us, we find that section 4.5.1 of MFV's operating agreement did not give Ms. Mirowski as the majority percentage member of MFV (or as MFV's general manager) the authority to determine the timing and the amount of distributions of MFV's cash flow and MFV's capital proceeds.[62]  On that record,

---

[62]In so finding, we have considered respondent's contention that Ms. Mirowski had "by implication" the power to determine the respective amounts of MFV's cash flow and MFV's capital proceeds to be distributed.  According to respondent,

> [MFV's operating agreement] Section 4.2.3, which states that the amount of capital proceeds to be distributed is to be reduced by "any reserves which the General Manager deems necessary for liabilities or obligations of the Company . . . .", gives decedent the power to determine the amount of such reserves, and by implication, the amount of such distributions.  [MFV's operating agreement] Section 1 [defines] "Cash Flow" [and] gives decedent a similar power "to pay or establish reasonable reserves for future expenses, debt payments, capital improvements or replacements . . ." and thereby the amount of distributable cash flow. * * *

Ms. Mirowski's authority as MFV's general manager to establish reserves was limited to establishing reserves for MFV's liabilities and obligations and future expenses, debt payments, capital improvements, and replacements.  Moreover, Ms. Mirowski's authority as MFV's general manager to establish the types of reserves in question was subject to the fiduciary duties imposed on her by Maryland law.  See Robinson v. Geo Licensing Co., L.L.C., 173 F. Supp. 2d 419, 427 (D. Md. 2001); Froelich v. Erikson, 96 F. Supp. 2d 507, 526 (D. Md. 2000), affd. per curiam sub nom. Froelich v. Senior Campus Living, L.L.C., 5 Fed. Appx.

(continued...)

we further find that section 4.5.1 of MFV's operating agreement did not give Ms. Mirowski as the majority percentage member of MFV (or as MFV's general manager) the authority to determine the timing and the amount of distributions upon the liquidation and dissolution of MFV.[63]

On the record before us, we find that at the time of Ms. Mirowski's gifts and at the time of her death there was no express agreement in MFV's operating agreement (or elsewhere) that Ms. Mirowski retain the possession or the enjoyment of, or the right to the income from, the respective 16-percent interests in MFV that she gave to her daughters' trusts.

---

[62](...continued)
287 (4th Cir. 2001). We find nothing in the record that shows that Ms. Mirowski intended to establish, or would have established, the reserves in question in violation of those duties. On the record before us, we conclude that Ms. Mirowski's authority as MFV's general manager to establish reserves as specified in MFV's operating agreement did not give Ms. Mirowski an interest or a right described in sec. 2036(a)(1) (or sec. 2036(a)(2)).

[63]Section 4.4.1 of MFV's operating agreement provides that if MFV were to be liquidated, its assets

> shall be distributed to the Interest Holders in accordance with the balances in their respective Capital Accounts, after taking into account the allocations of Profit or Loss pursuant to Section 4.1 or 4.2, if any, and distributions, if any, of cash or property, if any, pursuant to Sections 4.1 and 4.2.3 [of MFV's operating agreement].

We conclude that section 4.5.1 of MFV's operating agreement merely served as a backstop to the other sections of MFV's operating agreement that controlled the timing and the amount of distributions by MFV.

In support of respondent's contention that at the time of
Ms. Mirowski's gifts and at the time of her death there was an
implied agreement that Ms. Mirowski retain an interest or a right
described in section 2036(a)(1) with respect to the respective
16-percent interests in MFV that she gave to her daughters'
trusts, respondent relies on essentially the same contentions on
which respondent relies in support of respondent's argument that
Ms. Mirowski's transfers to MFV were not bona fide sales for
adequate and full consideration in money or money's worth under
section 2036(a).  We have considered and rejected those conten-
tions.  For the reasons stated above, we reject respondent's
contentions here in determining whether at the time of Ms.
Mirowski's gifts and at the time of her death there was an
implied agreement that she retain an interest or a right de-
scribed in section 2036(a)(1) with respect to the respective 16-
percent interests in MFV that she gave to her daughters' trusts.

We shall, however, address again what respondent considers
to be of "particular significance" in our determining whether at
the time of Ms. Mirowski's gifts and at the time of her death
there was an implied agreement that she retain an interest or a
right described in section 2036(a)(1) with respect to the respec-
tive 16-percent interests in MFV that she gave to her daughters'
trusts, namely, during 2002, MFV distributed $36,415,810 to
decedent's estate which that estate used to pay Federal and State

transfer taxes, legal fees, and other estate obligations.[64]  As

discussed above, we have found that the only anticipated signifi-

cant financial obligation of Ms. Mirowski when she formed and

funded MFV and when she made the respective gifts to her daugh-

ters' trusts was the substantial gift tax for which she would be

liable with respect to those gifts.  We have also found that at

no time before Ms. Mirowski's death did the members of MFV have

any express or unwritten agreement or understanding to distribute

assets of MFV in order to pay that gift tax liability.  In order

to pay the anticipated gift tax liability with respect to her

contemplated respective gifts of 16-percent interests in MFV to

her daughters' trusts, Ms. Mirowski could have (1) used a portion

of the over $7.5 million of personal assets that she retained and

did not transfer to MFV, including cash and cash equivalents of

over $3.3 million, (2) used a portion or all of the distributions

that she expected to receive as an interest holder in MFV of the

millions of dollars of royalty payments under the ICD patents

_____

[64]Included in the Federal and State transfer taxes was
$11,750,623 that decedent's personal representatives paid in
April 2002 as the estimated gift tax liability with respect to
Ms. Mirowski's respective gifts of 16-percent interests in MFV to
her daughters' trusts.  In July 2002, those representatives filed
on behalf of Ms. Mirowski the 2001 Form 709 that showed actual
gift tax liability for 2001 of $9,729,280, resulting in a credit
to decedent's estate.  Respondent determined a deficiency in Ms.
Mirowski's gift tax for 2001 attributable to the value of each of
Ms. Mirowski's gifts.  The parties have resolved their dispute as
to the gift tax of Ms. Mirowski for 2001.  See supra notes 1 and
36.

license agreement that she expected MFV to receive, and
(3) borrowed against (a) the personal assets that she retained
and did not transfer to MFV and (b) her 52-percent interest in
MFV,[65] see Md. Code Ann., Corps. & Assns. sec. 4A-602 (West
2008); Md. Code Ann., Com. Law sec. 1-201(37) (West 2008).

In addition, as also discussed above, we have found that at
no time before September 10, 2001, when Ms. Mirowski's condition
unexpectedly deteriorated significantly, did Ms. Mirowski, her
daughters, or her physicians expect her to die and that conse-
quently at no time did Ms. Mirowski and her daughters discuss or
anticipate the estate tax and similar transfer taxes and the
other estate obligations that would arise only as a result of Ms.
Mirowski's death.[66]

In 2002, after Ms. Mirowski died, MFV distributed over $36
million to decedent's estate in order for the estate to pay
Federal and State transfer taxes, legal fees, and other estate
obligations.  At the time in 2002 when MFV made those distribu-
tions to decedent's estate, MFV's members (i.e., the daughters'
trusts),[67] through their respective trustees (i.e., Ms.

---

[65]See supra note 48.

[66]As discussed supra note 49, the estate tax that would
arise only as a result of Ms. Mirowski's death would not have
been the obligation of Ms. Mirowski.

[67]The daughters' trusts were the remaining members of MFV
after Ms. Mirowski's death.

Mirowski's daughters), agreed and decided that MFV should not make distributions to them.[68]  In making that decision, MFV's members had in mind that those members will own collectively 100 percent of MFV, in three equal shares, after decedent's estate is closed.

On the record before us, we conclude that the decision by MFV's members after Ms. Mirowski died to have MFV distribute during 2002 over $36 million to decedent's estate, which the estate used to pay Federal and State transfer taxes, legal fees, and other estate obligations, is not determinative in the instant case of whether at the time of Ms. Mirowski's gifts and at the time of her death there was an implied agreement that Ms. Mirowski retain an interest or a right described in section 2036(a)(1) with respect to the respective 16-percent interests in MFV that she gave to her daughters' trusts.

On the record before us, we find that at the time of Ms. Mirowski's gifts and at the time of her death there was no implied agreement or understanding that Ms. Mirowski retain the possession or the enjoyment of, or the right to the income from, the respective 16-percent interests in MFV that she gave to her daughters' trusts.

---

[68]In other words, MFV's members (i.e., the daughters' trusts) agreed and decided that during 2002 MFV should not make pro rata distributions to all of the interest holders of MFV.

Based upon our examination of the entire record before us, we find that at the time of Ms. Mirowski's gifts and at the time of her death Ms. Mirowski did not retain the possession or the enjoyment of, or the right to the income from, the 16-percent interests in MFV that she gave to her daughters' trusts within the meaning of section 2036(a)(1).

> Right To Designate the Persons Who Shall
> Possess or Enjoy the Property Transferred
> or the Income From Such Property

It is the position of decedent's estate that Ms. Mirowski did not retain a right described in section 2036(a)(2) with respect to the respective 16-percent interests in MFV that she gave to her daughters' trusts.

Respondent counters:

With the approval of the daughters (now the other interest holders), decedent had the authority to dispose of assets in other than the ordinary course of business. [MFV's operating agreement] Section 5.1.3.1. As the holder of a majority of the MFV interests, decedent alone held the power to determine the timing of the distribution of the capital transaction proceeds. [MFV's operating agreement] Section 4.5.1. Thus, after the transfer of the three 16 percent interests, decedent held the right, in conjunction with her daughters, to designate the person or persons who shall possess or enjoy the proceeds of the transferred property, within the meaning of section 2036(a)(2), with the result that the assets transferred to MFV are includible in the gross estate. * * *

Before addressing the linchpin in respondent's argument under section 2036(a)(2), we reject respondent's contention that Ms. Mirowski's daughters were members of MFV after Ms. Mirowski's

gifts.  After those gifts, the daughters' trusts, and not Ms. Mirowski's daughters, were members of MFV.[69]

We turn now to the linchpin in respondent's argument under section 2036(a)(2), namely, under section 4.5.1 of MFV's operating agreement Ms. Mirowski "alone held the power to determine the timing of the distribution of the capital transaction proceeds."  We have considered and rejected that contention when we addressed respondent's argument under section 2036(a)(1) with respect to Ms. Mirowski's gifts.  For the reasons stated above, we reject respondent's contention here in determining whether at the time of Ms. Mirowski's gifts and at the time of her death Ms. Mirowski retained a right described in section 2036(a)(2) with respect to the respective 16-percent interests in MFV that she gave to her daughters' trusts.

Based upon our examination of the entire record before us, we find that at the time of Ms. Mirowski's gifts and at the time of her death Ms. Mirowski did not retain, either alone or in conjunction with any person, the right to designate the persons who shall possess or enjoy the respective 16-percent interests in MFV that she gave to her daughters' trusts or the income from such interests within the meaning of section 2036(a)(2).

Based upon our examination of the entire record before us, we hold that section 2036(a) does not apply to Ms. Mirowski's

---

[69]See supra note 56.

respective gifts of 16-percent interests in MFV to her daughters' trusts.

Section 2038(a)(1)

In order to resolve the parties' dispute under section 2038(a)(1),[70] we must consider the following factual issues (1) with respect to Ms. Mirowski's transfers to MFV and (2) with respect to Ms. Mirowski's gifts:

(1) Was there a transfer of property by Ms. Mirowski?

(2) If there was a transfer of property by Ms. Mirowski, was such a transfer not a bona fide sale for an adequate and full consideration in money or money's worth?

---

[70]Sec. 2038(a)(1) provides:

SEC. 2038.   REVOCABLE TRANSFERS.

(a) In General.--The value of the gross estate shall include the value of all property--

(1) Transfers after June 22, 1936.--To the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, where the enjoyment thereof was subject at the date of his death to any change through the exercise of a power (in whatever capacity exercisable) by the decedent alone or by the decedent in conjunction with any other person (without regard to when or from what source the decedent acquired such power), to alter, amend, revoke, or terminate, or where any such power is relinquished during the 3-year period ending on the date of the decedent's death.

(3) If there was a transfer of property by Ms. Mirowski that was not a bona fide sale for an adequate and full consideration in money or money's worth, (a) at the time of her death was the enjoyment of the property transferred subject to any change through the exercise of a power by Ms. Mirowski, alone or in conjunction with any other person,[71] to alter, amend, revoke, or terminate within the meaning of section 2038(a)(1) or (b) did Ms. Mirowski relinquish any such power during the three-year period ending on the date of her death within the meaning of that section?

### Ms. Mirowski's Transfers to MFV

#### Transfer of Property by Decedent

As discussed above, decedent's estate acknowledges that Ms. Mirowski made transfers of assets to MFV on September 1, 5, 6, and 7, 2001.  In light of that acknowledgment by decedent's estate, we find that Ms. Mirowski's transfers to MFV were transfers of property under section 2038(a)(1).

---

[71]Sec. 2038(a)(1) does not apply

If the decedent's power could be exercised only with the consent of all parties having an interest (vested or contingent) in the transferred property, and if the power adds nothing to the rights of the parties under local law * * *

Sec. 20.2038-1(a)(2), Estate Tax Regs.

Transfer Other Than a Bona Fide Sale for an Adequate
and Full Consideration in Money or Money's Worth

Like section 2036(a), section 2038(a)(1) excepts from its application any transfer of property otherwise subject to that section which is a "bona fide sale for an adequate and full consideration in money or money's worth". The respective exceptions in sections 2036(a) and 2038(a)(1) have the same meaning. Based upon our examination of the entire record before us and for the reasons stated above with respect to our finding that Ms. Mirowski's transfers to MFV were bona fide sales for adequate and full consideration in money or money's worth under section 2036(a), we find that Ms. Mirowski's transfers to MFV were bona fide sales for adequate and full consideration in money or money's worth under section 2038(a)(1). Based upon that examination and for those reasons, we further find that the exception under section 2038(a)(1) for a bona fide sale for an adequate and full consideration in money or money's worth applies to Ms. Mirowski's transfers to MFV.

Power To Alter, Amend, Revoke, or Terminate
the Enjoyment of the Property Transferred or
Relinquishment of Any Such Power During the
Three-Year Period Ending on the Date of Death

We have found that Ms. Mirowski's transfers to MFV were bona fide sales for adequate and full consideration in money or money's worth under section 2038(a)(1). Consequently, we need not, and we shall not, address the factual issues presented under

section 2038(a)(1) as to (1) whether at the time of Ms.
Mirowski's death the enjoyment of the property transferred was
subject to any change through the exercise of a power by Ms.
Mirowski, alone or in conjunction with any other person, to
alter, amend, revoke, or terminate or (2) whether Ms. Mirowski
relinquished any such power during the three-year period ending
on the date of her death.

Based upon our examination of the entire record before us,
we hold that section 2038(a)(1) does not apply to Ms. Mirowski's
transfers to MFV.

### Ms. Mirowski's Gifts

#### Transfer of Property by Ms. Mirowski

As discussed above, decedent's estate acknowledges that Ms.
Mirowski's respective gifts of 16-percent interests in MFV to her
daughters' trusts on September 7, 2001, were transfers of
property.  In light of that acknowledgment by decedent's estate,
we find that Ms. Mirowski's gifts were transfers of property
under section 2038(a)(1).

##### Transfer Other Than a Bona Fide Sale for an Adequate and Full Consideration in Money or Money's Worth

Decedent's estate also acknowledges that Ms. Mirowski's
gifts were not bona fide sales for adequate and full
consideration in money or money's worth under section 2038(a)(1).
In light of that acknowledgment by decedent's estate, we find
that Ms. Mirowski's gifts were not bona fide sales for adequate

and full consideration in money or money's worth under section 2038(a)(1).

#### Power To Alter, Amend, Revoke, or Terminate the Enjoyment of the Property Transferred or Relinquishment of Any Such Power During the Three-Year Period Ending on the Date of Death

##### Power To Alter, Amend, Revoke, or Terminate the Enjoyment of the Property Transferred

It is the position of decedent's estate that at no time was the enjoyment of the respective 16-percent interests that Ms. Mirowski gave to her daughters' trusts subject to change through the exercise of a power by Ms. Mirowski to alter, amend, revoke, or terminate.

Respondent counters that after Ms. Mirowski's respective gifts of 16-percent interests in her daughters' trusts,

> With the approval of the other interest holders (the daughters),[72] decedent had the authority to dispose of assets in other than the ordinary course of business. [MFV's operating agreement] Section 5.1.3.1. As the holder of a majority of the MFV interests, decedent alone held the power to determine the timing of the distribution of the capital transaction proceeds. [MFV's operating agreement] Section 4.5.1. Thus, after the transfer of the three 16 percent interests, decedent held the power, in conjunction with her daughters, to affect the time or manner of enjoyment of the transferred property within the meaning of section 2038(a)(1), with the result that despite the gifts, the assets transferred to MFV are includible in the gross estate. As decedent retained this power until her death, there is no need to discuss the application of the three-year rule * * * of section * * * 2038[(a)(1)] * * *.

---

[72]We reject here, as we did above, respondent's contention that after Ms. Mirowski's gifts her daughters, and not her daughters' trusts, were members of MFV.

In support of respondent's argument under section 2038(a)(1), respondent relies on essentially the same contentions on which respondent relies in support of respondent's argument under section 2036(a)(2). We considered and rejected those contentions when we addressed respondent's argument under section 2036(a)(2). For the reasons stated above, we reject respondent's contentions here in determining whether at the time of Ms. Mirowski's death Ms. Mirowski held the power to alter, amend, revoke, or terminate the enjoyment of the respective 16-percent interests in MFV that she gave to her daughters' trusts.

Based upon our examination of the entire record before us, we find that at no time, including at the time of Ms. Mirowski's death, was the enjoyment of the respective 16-percent interests in MFV that Ms. Mirowski gave to her daughters' trusts subject to any change through the exercise of a power by her, alone or in conjunction with any other person, to alter, amend, revoke, or terminate within the meaning of section 2038(a)(1).

Relinquishment During the Three-Year
Period Ending on the Date of Death of a
Power To Alter, Amend, Revoke, or Terminate
the Enjoyment of the Property Transferred

We have found that at no time, including at the time of Ms. Mirowski's death, was the enjoyment of the respective 16-percent interests in MFV that Ms. Mirowski gave to her daughters' trusts subject to any change through the exercise of a power by her, alone or in conjunction with any other person, to alter, amend,

revoke, or terminate within the meaning of section 2038(a)(1).  A fortiori, Ms. Mirowski could not have relinquished, and we find on the record before us that she did not relinquish, any such power during the three-year period ending on the date of her death within the meaning of that section.

Based upon our examination of the entire record before us, we hold that section 2038(a)(1) does not apply to Ms. Mirowski's respective gifts of 16-percent interests in MFV to her daughters' trusts.

Section 2035(a)

In order to resolve the parties' dispute under section 2035(a),[73] we must consider the following issues with respect to

----

[73]Sec. 2035(a) provides:

SEC. 2035.  ADJUSTMENTS FOR CERTAIN GIFTS MADE WITHIN 3 YEARS OF DECEDENT'S DEATH.

(a) Inclusion of Certain Property in Gross Estate.--If--

(1) the decedent made a transfer (by trust or otherwise) of an interest in any property, or relinquished a power with respect to any property, during the 3-year period ending on the date of the decedent's death, and

(2) the value of such property (or an interest herein) would have been included in the decedent's gross estate under section 2036, 2037, 2038, or 2042 if such transferred interest or relinquished power had been retained by the decedent on the date of his death, the value of the gross estate shall include the value of any property (or interest therein) which would have

(continued...)

Ms. Mirowski's respective gifts of 16-percent interests in MFV to her daughters' trusts:[74]

(1) Was there a transfer of property by Ms. Mirowski during the three-year period ending on the date of her death?

(2) If there was a transfer of property by Ms. Mirowski during the three-year period ending on the date of her death, would the value of any such property have been included in her gross estate under section 2036 or 2038[75] if the property transferred by Ms. Mirowski had been retained by her on the date of her death?

Transfer of Property During the Three-Year
Period Ending on the Date of Death

Decedent's estate acknowledges that Ms. Mirowski's respective gifts of 16-percent interests in MFV to her daughters' trusts on September 7, 2001, were transfers of property during the three-year period ending on the date of her death. In light

_____

[73](...continued)
been so included.

[74]In advancing respondent's alternative argument under sec. 2035(a), respondent does not assert that during the three-year period ending on the date of Ms. Mirowski's death Ms. Mirowski relinquished a power with respect to the respective 16-percent interests in MFV that she gave to her daughters' trusts. Therefore, our discussion of sec. 2035(a) is limited to Ms. Mirowski's gifts.

[75]In advancing respondent's alternative argument under sec. 2035(a), respondent does not assert that Ms. Mirowski's transfers to MFV are includible in her gross estate under sec. 2037 or 2042. Therefore, our discussion of sec. 2035(a) is limited to secs. 2036 and 2038.

of that acknowledgment by decedent's estate, we find that Ms. Mirowski's gifts were transfers of property during the three-year period ending on the date of her death under section 2035(a).

Property Transferred Otherwise Includible in Gross Estate

We have found that sections 2036(a) and 2038(a)(1) do not apply to Ms. Mirowski's transfers to MFV. A fortiori, section 2035(a) could not apply, and we hold that that section does not apply, to Ms. Mirowski's respective gifts of 16-percent interests in MFV to her daughters' trusts.

Based upon our examination of the entire record before us and our holdings under sections 2036(a) and 2038(a)(1) with respect to Ms. Mirowski's transfers to MFV, we hold that section 2035(a) does not apply to Ms. Mirowski's respective gifts of 16-percent interests in MFV to her daughters' trusts.

We have considered all of the parties' respective contentions and arguments that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing and the concessions of the parties,

Decision will be entered under Rule 155.

APPENDIX

MFV's operating agreement provided in pertinent part:

SECTION I
DEFINED TERMS

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"Adjusted Capital Balance" means, as of any day, an Interest Holder's total Capital Contributions less all amounts actually distributed to the Interest Holder pursuant to Sections 4.2.3.4.1 and 4.4 hereof.  If any Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Balance of the transferor to the extent the Adjusted Capital Balance relates to the Interest transferred.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

"Capital Account" means the account to be maintained by the Company for each Interest Holder in accordance with the following provisions:

(i) an Interest Holder's Capital Account shall be credited with the Interest Holder's Capital Contributions, the amount of any Company liabilities assumed by the Interest Holder (or which are secured by Company property distributed to the Interest Holder), the Interest Holder's allocable share of Profit, and any item in the nature of income or gain specially allocated to the Interest Holder pursuant to the provisions of Section IV (other than Section 4.3.3); and

(ii) an Interest Holder's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Interest Holder, the amount of any liabilities of the Interest Holder assumed by the Company (or which are secured by property contributed by the Interest Holder to the Company), the Interest Holder's allocable share of Loss, and any item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to the provisions of Section IV (other than Section 4.3.3).

If any Membership Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the transferred Membership Interest.  If the book value of Company property is adjusted pursuant to Section 4.3.3. the Capital Account of each Membership Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized a gain or loss equal to the amount of such aggregate adjustment.  It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

"Capital Contribution" means that total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.

"Capital Proceeds" means the gross receipts received by the Company from a Capital Transaction.

"Capital Transaction" means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds.

"Cash Flow" means all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any non-cash charges, but less cash funds used to pay current operating expenses and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements or replacements as determined in the sole discretion of the General Manager.  Cash Flow shall not include Capital Proceeds but shall be increased by the reduction of any reserve previously established.

\*      \*      \*      \*      \*      \*      \*

"Interest Holder" means any Person who holds a Membership Interest, whether as a Member or as an unadmitted assignee of a Member.

\*      \*      \*      \*      \*      \*      \*

"Member" means each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company.

\*      \*      \*      \*      \*      \*      \*

"Negative Capital Account" means a Capital Account with a balance of less than zero.

\*      \*      \*      \*      \*      \*      \*

"Positive Capital Account" means a Capital Account with a balance greater than zero.

\*      \*      \*      \*      \*      \*      \*

SECTION III
Members; Capital; Capital Accounts

\*      \*      \*      \*      \*      \*      \*

3.4.  Return of Capital Contributions.  Except as otherwise provided in this Agreement, no Interest older shall have the right to receive the return of any Capital Contribution.

3.5.  Form of Return of Capital.  If an Interest Holder is entitled to receive a return of a Capital Contribution, the Company may distribute cash, notes, property or a combination thereof to the Interest Holder in return of the Interest Holder's Capital Contribution.

3.6.  Capital Accounts.  A separate Capital Account shall be maintained for each Interest Holder.

\*      \*      \*      \*      \*      \*      \*

SECTION IV
Profit, Loss and Distributions

4.1. <u>Distributions of Cash Flow and Allocations of Profit or Loss Other than Capital Transactions</u>.

4.1.1. <u>Profit or Loss other than from a Capital Transaction</u>. After giving effect to the special allocations [for purposes of subchapter K of the Internal Revenue Code] set forth in Section 4.3, for any taxable year of the Company, Profit or Loss (other than Profit or Loss resulting from a Capital Transaction, which Profit or Loss shall be allocated in accordance with the provisions of Section 4.2.1. and 4.2.2.) shall be allocated to the Interest Holders in proportion to their Percentages.

4.1.2. <u>Distributions of Cash Flow</u>. Cash Flow for each taxable year of the Company shall be distributed to the Interest Holders in proportion to their Percentages no later than seventy-five (75) days after the end of the taxable year.

4.2. <u>Distribution of Capital Proceeds and Allocation of Profit or Loss from Capital Transactions</u>.

4.2.1. <u>Profit</u>. After giving effect to the special allocations [for purposes of subchapter K of the Internal Revenue Code] set forth in Section 4.3, Profit from a Capital Transaction shall be allocated as follows:

4.2.1.1. If one or more Interest Holders has a Negative Capital Account, to those Interest Holders, in proportion to their Negative Capital Accounts, until all of those Negative Capital Accounts have been reduced to zero.

4.2.1.2. Any Profit not allocated pursuant to Section 4.2.1.1 shall be allocated to the Interest Holders in proportion to, and to the extent of, the amounts distributable to them pursuant to Section 4.2.3.4.1. and 4.2.3.4.3

4.2.1.3. Any Profit in excess of the foregoing allocation shall be allocated to the Interest Holders in proportion to their Percentages.

4.2.2. <u>Loss</u>. After giving effect to the special allocation [for purposes of subchapter K of the Internal Revenue Code] set forth in Section 4.3, Loss from a Capital Transaction shall be allocated as follows:

4.2.2.1. If one or more Interest Holder(s) has a Positive Capital Account, to those Interest Holders, in proportion to their Positive Capital Accounts, until all Positive Capital Accounts have been reduced to zero.

4.2.2.2. Any Loss not allocated to reduce Positive Capital Accounts to zero pursuant to Section 4.2.2.1. shall be allocated to the Interest Holders in proportion to their Percentages.

4.2.3. <u>Capital Proceeds</u>. Capital Proceeds shall be distributed and applied by the Company in the following order and priority:

4.2.3.1. to the payment of all expenses of the Company incident to the Capital Transaction; then

4.2.3.2. to the payment of debts and liabilities of the Company then due and outstanding (including all debts due to any Interest Holder); then

4.2.3.3. to the establishment of any reserves which the General Manager deems necessary for liabilities or obligations of the Company; then

4.2.3.4. the balance shall be distributed as follows:

4.2.3.4.1. to the Interest Holders in proportion to their Adjusted Capital Balances, until their remaining Adjusted Capital Balances have been paid in full;

4.2.3.4.2. if any Interest Holder has a Positive Capital Account after the distributions made pursuant to Section 4.2.3.4.1 and before any further allocation of Profit pursuant to Section 4.2.1.3., to those Interest Holders in proportion to their Positive Capital Accounts; then

4.2.3.4.3.  the balance, to the Interest Holders in proportion to their Percentages.

\*       \*       \*       \*       \*       \*       \*

4.4.  <u>Liquidation and Dissolution</u>.

4.4.1.  If the Company is liquidated, the assets if the Company shall be distributed to the Interest Holders in accordance with the balances in their respective Capital Accounts, after taking into account the allocations of Profit or Loss pursuant to Section 4.1 or 4.2, if any, and distributions, if any, of cash or property, if any, pursuant to Sections 4.1 and 4.2.3.

\*       \*       \*       \*       \*       \*       \*

4.5.1.  Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Members holding a majority of the Percentages then outstanding.

\*       \*       \*       \*       \*       \*       \*

SECTION V
Management:  Rights, Powers and Duties

5.1.  <u>Management</u>.

5.1.1.  <u>General Manager</u>.  The Company shall be managed by a General Manager, who may, but need not, be a Member.  Anna Mirowski is hereby designated to serve as the initial General Manager.

5.1.2.  <u>General Powers</u>.  The General Manager shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs, including without limitation, for Company purposes, the power to:

5.1.2.1.  acquire by purchase, lease, or otherwise, any real or personal property, tangible or intangible;

5.1.2.2. construct, operate, maintain, finance, and improve, and to own, sell, convey, assign, mortgage, or lease any real estate and any personal property;

5.1.2.3. sell, dispose, trade, or exchange Company assets in the ordinary course of the Company's business;

5.1.2.4. enter into agreements and contract and to give receipts, releases and discharges;

5.1.2.5. purchase liability and other insurance to protect the Company's properties and business;

5.1.2.6. borrow money for and on behalf of the Company, and, in connection therewith, execute and deliver instruments authorizing the confession of judgment against the Company.

5.1.2.7. execute or modify leases with respect to any part or all of the assets of the Company;

5.1.2.8. prepay, in whole or in part, refinance, amend, modify, or extend any mortgages or deeds of trust which may affect any asset of the Company and in connection therewith to execute for and on behalf of the Company any extensions, renewals, or modifications of such mortgages or deeds of trust;

5.1.2.9. execute any and all other instruments and documents which may be necessary or in the opinion of the General Manager desirable to carry out the intent and purpose of this Agreement, including, but not limited to, documents whose operation and effect extend beyond the term of the Company;

5.1.2.10. make any and all expenditures which the General Manager, it its sole discretion, deems necessary or appropriate in connection with the management of the affairs of the Company and the carrying out of its obligations and responsibilities under this Agreement, including, without limitation, all legal, accounting, and other related expenses incurred in connection with the organization and financing and operation of the Company;

5.1.2.11. enter into any kind of activity necessary to, in connection with, or incidental to, the accomplishment of the purposes of the Company; and

5.1.2.12. invest and reinvest Company reserves in short-term instruments or money market funds.

5.1.3. <u>Extraordinary Transactions</u>.

5.1.3.1. Notwithstanding anything to the contrary in this Agreement, the General Manager shall not undertake any of the following without the approval of the Members:

5.1.3.2. any Capital Transaction;

5.1.3.3. the Company's lending more than $50,000 of its money on any one occasion;

5.1.3.4. the admission of additional Members to the Company;

5.1.3.5. the Company's engaging in business in any jurisdiction which does not provide for the registration of limited liability companies; and

5.1.3.6. the Company's electing to exercise any Purchase Option pursuant to Section 6.4.

\*  \*  \*  \*  \*  \*  \*

5.1.5. <u>Removal of General Manager</u>. A majority of the Percentages held by all Members, at any time and from time to time and for any reason, may remove the General manager then acting and elect a new General Manager.

\*  \*  \*  \*  \*  \*  \*

SECTION VI
Transfer of Interests and Withdrawals of Members

6.1. <u>Transfers</u>.

6.1.1. No Person may Transfer all or any

portion of or any interest or rights in the Person's Membership Rights or Membership Interest unless the following conditions ("Conditions of Transfer") are satisfied:

6.1.1.1.  the Transfer will not require registration of Membership Interests or Membership Rights under any federal or state securities laws;

6.1.1.2.  the transferee delivers to the Company a written instrument agreeing to be bound by the terms of Section VI of this Agreement;

6.1.1.3.  the Transfer will not result in the termination of the Company pursuant to Code Section 708;

6.1.1.4.  the Transfer will not result in the Company being subject to the Investment Company Act of 1940, as amended;

6.1.1.5.  the transferor or the transferee delivers the following information to the Company:  (i) the transferee's taxpayer identification number; and (ii) the transferee's initial tax basis in the Transferred Interest; and

6.1.1.6.  the transferor complies with the provisions set forth in Section 6.1.4.

6.1.2.  If the Conditions of Transfer are satisfied, then a Member or Interest Holder may Transfer all or any portion of that Person's Membership Interest.  The Transfer of a Membership Interest pursuant to this Section 6.1. shall not result, however, in the Transfer of any of the transferor's other Membership Rights, if any, and the transferee of the Membership Interest shall have no right to:  (i) become a Member; (ii) exercise any Membership Rights other than those specifically pertaining to the ownership of a Membership Interest; or (iii) act as na agent of the Company.

6.1.3.  Each Member hereby acknowledges the reasonableness of the prohibition contained in this Section 6.1. in view of the purposes of the Company and the relationship of the Members.  The Transfer of any Membership Rights or Membership Interests in violation

of the prohibition contained in this Section 6.1 shall be deemed invalid, null and void, and of no force or effect.  Any Person to whom Membership Rights are attempted to be transferred in violation of this Section 6.1. shall not be entitled to vote on matters coming before the Members, participate in the management of the Company, act as an agent of the Company, receive distributions from the Company, or have any other rights in or with respect to the Membership Rights.

### 6.1.4.  Right of First Offer.

6.1.4.1.  If an Interest Holder (a "Transferor") desires to Transfer all or any portion of, or any interest or rights in, the Transferor's Interest (the "Transferor Interest"), the Transferor shall notify the Company of that desire (the "Transfer Notice").  The Transfer Notice shall describe the Transferor Interest.  The Company shall have the option (the "Purchase Option") to purchase all of the Transferor Interest for a price, (the "Purchase Price"), equal to the Transferor's Percentage times Appraised Value.

6.1.4.2.  The Purchase Option shall be and remain irrevocable for a period (the "Transfer Period") ending at 11:59 p.m. local time at the Company's principal office on the thirtieth (30th) Day following the date the Transfer Notice is given to the Company.

6.1.4.3.  At any time during the Transfer Period, the Company may elect to exercise the Purchase Option by giving written notice of its election to the Transferor.  The Transferor shall not be deemed a Member for the purpose of voting on whether the Company shall elect to exercise the Purchase Option.

6.1.4.4.  If the Company elects to exercise the Purchase Option, the Company's notice of its election shall fix a closing date (the "Transfer Closing Date") for the purchase, which shall not be earlier than five (5) days after the date of the notice of election or more than thirty (30) days after the expiration of the Transfer Period.

6.1.4.5. If the Company elects to exercise the Purchase Option, the Purchase Price shall be paid in cash (or in cash and a promissory note in accordance with Section 6.5) on the Transfer Closing Date.

6.1.4.6. If the Company fails to exercise the Purchase Option, the Transferor shall be permitted to offer and sell for a period of ninety (90) days (the "Free Transfer Period") after the expiration fo the Transfer Period at a price not less than the Purchase Price. If the Transferor does not Transfer the Transferor Interest within the Free Transfer Period, the Transferor's right to Transfer the Transferor Interest pursuant to this Section shall cease and terminate.

6.1.4.7. Any Transfer of the Transferor Interest made after the last day of the Free Transfer Period or without strict compliance with terms, provisions, and conditions of this Section and other terms, provisions, and conditions of this Agreement, shall be null, void and of no force or effect.

6.1.5. <u>Transfers to Affiliates and Family</u>. Notwithstanding anything set forth in this Agreement to the contrary, but provided that the Conditions of Transfer other than Section 6.1.6. are satisfied, any Member may at any time, and from time to time, Transfer all, or any portion of, or any interest or rights in, the Member's Membership Interest or Membership Rights to (i) any other Member; (ii) any member of the Member's Family; or (iii) any Affiliate of the Member.

6.1.6. <u>Admission of Transferee as Member</u>. Notwithstanding anything contained herein to the contrary, the transferee of all or any portion of or any interest or rights in any Membership Right shall not be entitled to become a Member or exercise any rights of a Member and shall only be admitted as a Member upon the unanimous consent of the Members. The transferee shall be entitled to receive, to the extent transferred, only the distributions to which the transferor would be entitled.

6.2. <u>Voluntary Withdrawal</u>. No Member shall have the right or power to Voluntarily Withdraw from the

Company.

    6.3.  Involuntary Withdrawal.  Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the withdrawn Member shall thereupon become an Interest Holder bu shall not become a Member. If the Company is continued as provided in Section 7.1.3., the successor Interest Holder shall have all the rights of an Interest Holder but shall not be entitled to receive in liquidation of the Membership Interest the fair market value of the Member's Membership Interest as of the date the Member involuntarily withdrew from the Company.

    6.4.  Appraised Value.

        6.4.1.  The term "Appraised Value" means the appraised value of the equity of the Company's assets as hereinafter provided.  Within fifteen (15) days after demand by either one or the other, the Company and the Withdrawing Member shall each appoint an appraiser to determine the value of the equity of the Company's Assets.  If the two appraisers agree upon the equity value of the Company's assets, they shall jointly render a single written report stating that value. If the two appraisers cannot agree upon the equity value of the Company's assets, they shall each render a separate written report and shall appoint a third appraiser, who shall appraise the Company's assets and determine the value of the equity therein, and shall render a written report of his or her opinion thereon. Each party shall pay the fees and costs of the appraiser appointed by that party, and the fees and other costs of the third appraiser shall be shared equally by both parties.

        6.4.2.  The equity value contained in the joint written report of the initial appraisers or the written report of the third appraiser, as the case may be, shall by the Appraised Value; provided, however, that if the value of the equity contained in the appraisal report of the third appraiser is more than the higher of the first two appraisals, the higher of the first two appraisals shall govern; and provided, further, that if the value of the equity contained in the appraisal report of the third appraiser is less than the lower of the first two appraisals, the lower

of the first two appraisals shall govern.

6.5. <u>Installment Buy-Outs</u>. Rather than pay all cash on the Closing Date, the Company may elect, on ten (10) days prior notice to the Transferor, to pay the Purchase Price on an installment basis. If it does so, then it shall pay 25% of the Purchase Price in cash on the Closing Date and the balance by executing and delivering its promissory note, in a form acceptable to both the Company and the Transferor, to the Transferor.

6.6. <u>Insolvency</u>.

6.6.1. If, immediately following the purchase of any Interest or Membership Rights, the Company would be insolvent, the Company shall be relieved of its obligation to purchase that portion of the Interest of Membership Rights that would render the Company insolvent or may nominate a purchaser for that portion of the Interest or Membership Rights Interest or Membership Rights.

6.6.2. If the Company is unable to pay lawfully for all of the Interests purchased under the applicable provisions of this Agreement, then no surviving or remaining Members shall be liable for or shall be required to assume the Company's obligation to purchase the balance of the Interests.

SECTION VII
Dissolution, Liquidation and Termination of the Company

7.1. <u>Events of Dissolution</u>. The Company shall be dissolved upon the happening of any of the following events:

7.1.1. upon the unanimous written agreement of all of the Members; or

7.1.2. upon the occurrence of an Involuntary Withdrawal of a Member, unless the remaining Members, within ninety (90) days after the occurrence of the Involuntary Withdrawal, unanimously elect to continue the business of the Company pursuant to the terms of this Agreement.

7.2. <u>Procedure for Winding Up and Dissolution</u>. If the Company is dissolved, the General Manager shall

wind up its affairs.  On winding up of the Company, the assets of the Company shall be distributed,

(i) to creditors of the Company, including interest Holders who are creditors, in satisfaction of the liabilities of the Company;

(ii) to Interest Holders and former Interest Holders in satisfaction of unpaid distributions;

(iii) to Interest Holders for the return of Capital Contributions; and

(iv) to Interest Holders in proportion to their respective Capital Accounts

and then to the Interest Holders in accordance with Section 4.4.  [Reproduced literally.]